# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Zickuhr v. Ericsson, Inc.*, 2011 IL App (1st) 103430**

| | |
|---|---|
| Appellate Court Caption | AMY ZICKUHR, Individually and as Special Administrator of the Estate of Richard Campbell, Deceased, and FLORENCE CAMPBELL, Plaintiffs-Appellees, v. ERICSSON, INC., Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3430 |
| Filed | September 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the death of plaintiff's decedent from mesothelioma allegedly caused by his exposure to defendant's asbestos-containing electrical cables, the appellate court affirmed the denial of defendant's motion for judgment *n.o.v.* or a new trial and held that OSHA regulations were properly excluded, that the trial court cured any error resulting from improper statements made during closing arguments by plaintiffs' counsel, and that plaintiffs' failure to disclose that one of their witnesses would testify that plaintiff's exposure to the asbestos contributed to his disease did not violate Supreme Court Rule 213. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-005433; the Hon. Richard Elrod, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Mark I. Tivin and Jeffrey S. Hood, both of O'Connell, Tivin, Miller & Burns, LLC, of Chicago, and H. Lane Young, Ollie M. Harton, and Hawkins Parnell, all of Thackston & Young LLP, of Atlanta, Georgia, for appellant.

William Connelly and Nicholas J. Vogelzang, both of Connelly & Vogelzang LLC, and Konstantine Sparagis and Babak Bakhtiari, both of Law Offices of Konstantine Sparagis, PC, both of Chicago, for appellees.

Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justices Garcia and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1 Following a jury trial, the jury awarded Richard Campbell's estate $1.5 million in damages as a result of defendant Ericsson, Inc.'s negligence in causing Richard's mesothelioma death from exposure to defendant's asbestos-containing electrical cables. Ericsson later filed a posttrial motion for judgment notwithstanding the verdict or, alternatively, for a new trial, which was denied.

¶ 2 On appeal, defendant contends the trial court erred in denying its posttrial motion because: (1) the evidence established that the cable the decedent worked with lacked asbestos; (2) plaintiffs failed to establish that the cable was the cause of the decedent's mesothelioma; (3) the trial court's exclusion of the Occupational Safety and Health Administration regulations prejudiced defendant; (4) plaintiffs' improper statements during closing arguments were prejudicial and deprived defendant of a fair trial; and (5) the trial court abused its discretion by allowing plaintiffs' controlled expert Dr. Steven Dikman to testify that defendant's cables were a contributing cause of the decedent's mesothelioma. We affirm.

¶ 3                                   BACKGROUND

¶ 4 Plaintiffs Richard Campbell (the decedent) and his wife Florence Campbell brought this negligence action against defendant on a claim that the decedent developed mesothelioma from exposure to asbestos-containing electrical cable manufactured by defendant. The decedent was diagnosed with mesothelioma in March 2008 and subsequently died from the illness on February 1, 2009. Plaintiffs' complaint was amended in February 2009 to include wrongful death and survivor counts.

¶ 5 From 1955 to 1985, the decedent worked at U.S. Steel's South Works plant, where he

drove a boom truck for the electric shop and performed maintenance functions. The position required the decedent to repair industrial wire, replace burnt cables, pull cable in and out of pipe conduit and take scrap cable to the salvage yard. Such duties involved the cutting and stripping of electrical wires and cables. The decedent claimed that his work produced asbestos dust that he disposed of using a coal shovel at the end of each workday.

¶ 6      The wire and cable used at South Works plant were originally manufactured and sold by Anaconda Wire and Cable Company (Anaconda). In 1974, Anaconda acquired Continental Wire and Cable (Continental) and in approximately 1980, Ericsson acquired Anaconda. Plaintiffs allege the wire and cable Anaconda sold to South Works contained asbestos. Plaintiffs further allege that as Anaconda's successor-in-interest, the defendant was negligent in failing to adequately warn of the dangers of asbestos exposure when using its products.

¶ 7      Plaintiffs originally brought action against several additional defendants for selling other asbestos-containing products to South Works without proper warning of asbestos danger. The other defendants settled, leaving Ericsson as the only remaining defendant at trial. After the jury verdict, the trial court entered judgment on the verdict but reduced the award to $560,000 to give the defendant credit for setoffs due to the prior settlements. Plaintiffs' case was consolidated with the case of Scott v. Ericsson, Inc., No. 08 L 13715, and the jury found in favor of Ericsson and against the Scott estate. The Scott estate did not appeal that decision. Raymond Scott was a union electrician who developed mesothelioma after working at U.S. Steel from 1970 until its close.[1]

¶ 8                                   The Trial

¶ 9                           *Decedent's Testimony*

¶ 10      Prior to his death, the decedent testified in a videotaped deposition to working with Anaconda's electrical wire at U.S. Steel, which contained asbestos. He recalled observing Anaconda cable in the 1950s and 1960s that designated "Anaconda" printed on its cable jackets and on the cable. The decedent testified that he knew the Anaconda cable was insulated with asbestos because the word "asbestos" was printed on its cable reels also. The decedent did not recall working with any product labeled "Continental."

¶ 11      The decedent testified that he worked with Anaconda wire and cable containing asbestos from 1955 to 1984 at U.S. Steel. He was diagnosed with mesothelioma in March 2008. The decedent testified that he stripped cable every day and would take the scrap cable out to the salvage yard and use shredders to strip the cable. He testified to stripping miles of cable. He would first shave off the insulation that covered the wires in the cable to save the copper core for salvage. His cable stripping work took place in a shanty where the shredding machine was located. During the shredding process, the shanty became so dusty that he "couldn't breathe." The dust from the cable shredding would cover him from head to toe, and the dust attached onto his clothes and hair. In addition, the decedent testified that as part of his maintenance duties he would repair old industrial wire, which involved stripping the wire

---

[1]The record does not reflect the year that U.S. Steel closed.

and installing lug nuts and cleaning the end of the cable with a knife when the cable burned up, and again removing the insulation. The decedent testified that cables used for electrical power in the plant frequently burned up and had to be replaced. These processes also created dust as well. When decedent pulled the wires and cable through conduit, dust was also created because debris would accumulate in the conduit and created dust when the cable was pulled. The decedent remembered seeing reels of Anaconda asbestos wire at U.S. Steel in the 1960s, but could not definitively recall seeing it there in the 1970s, but he did pull out old cable and wire on a continuous basis up until 1984. He knew the Anaconda wire was asbestos-insulated because he observed the word "asbestos" on the reels.

¶ 12                              *Raymond Scott's Testimony*

¶ 13        Raymond Scott testified via videotaped disposition on behalf of plaintiffs that while working at U.S. Steel beginning in the 1970s, he observed cable spools that read "asbestos Continental Cable Company." Scott testified that by stripping these cables, dust was produced and the workmen who stripped these cables were exposed to this dust on a daily basis for years. Scott also contracted mesothelioma and died prior to trial.

¶ 14                               *Erich Kothe's Testimony*

¶ 15        Erich Kothe, an engineer employed by Anaconda from 1951 to 1986, testified in a videotaped evidence deposition on behalf of plaintiff as a corporate representative of defendant. Kothe helped develop Anaconda's wire and cable products. He testified that Continental manufactured asbestos-containing wire from 1946 to 1984. He testified that chrysotile was the type of asbestos Continental used.

¶ 16        Kothe noted that although Anaconda acquired Continental in 1974, Anaconda stopped producing asbestos-containing cable in 1946, except by special order and that was usually varnish cambric cable, which was produced into the 1950s. Kothe testified that not only was wire with asbestos a health hazard, it was an unsuitable material in wiring cable and he does not know why it was even used. He testified the word "asbestos" was never printed on any Anaconda or Continental cable reels. He further testified that while he was employed at Anaconda, the company did not have the technology to print the name "Anaconda" directly on any cable jackets, the cable, or on the reels that contained asbestos.

¶ 17        Kothe testified that in the 1970s he visited the factory in Mexico where Continental added asbestos to its wire. He observed that Continental was coating wire with asbestos and did so from 1970 to 1984. Kothe testified that the Continental personnel would wear respirators around the asbestos because of the asbestos dust in the atmosphere. The Mexican factory also had a ventilation system to keep the dust from penetrating the rest of the factory "for the health of the employees." The personnel that handled the asbestos wore spacesuits, in which their heads were totally enclosed with air pumped into their suits in order to avoid any exposure to the asbestos dust.

¶ 18        Kothe testified that the first test defendant conducted concerning asbestos's dangers occurred in the 1990s as a result of an asbestos lawsuit against Ericsson. At that time, the tests were performed on Anaconda wire, but it has never been performed on Continental

wire. Defendant's lawyers had the test performed. They found some asbestos fibers were released into the air when wire from a reel labeled "Anaconda" was stripped. However, Kothe testified that when Anaconda sold varnish cambric cable that contained asbestos, it did not believe the product was hazardous because it contained saturated asbestos as opposed to raw asbestos. Kothe testified that defendant knew its customers would cut and strip its wires, but he said those actions released such small amounts of asbestos that it would not cause disease. Kothe conceded that Anaconda's own corporate literature stated "Anaconda Continental." These brochures referenced asbestos-containing wire and were offered and received in evidence and published to the jury. Kothe confirmed that when wire is pulled through conduit, the casing can become damaged.

¶ 19                              *Dr. Steven Dikman's Testimony*

¶ 20     Dr. Steven Dikman, a pathologist, was plaintiffs' controlled expert practicing pathology at Mount Sinai Hospital in New York City since 1969. Dr. Dikman testified that Mount Sinai Hospital conducts a significant amount of clinical and experimental research investigating asbestos effects. Dr. Dikman testified that exposure to any type of asbestos can cause mesothelioma.

¶ 21     Dr. Dikman was asked a hypothetical question to establish the causation of decedent's mesothelioma. Ericsson objected based on Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) grounds. The trial court overruled the objection and Dr. Dikman opined that plaintiff's occupational exposure to significant asbestos dust would be a contributing factor to mesothelioma. Dr. Dikman testified that exposure to asbestos "may be present for 50 years [in the pleura or lung area] after exposure."

¶ 22                              *Dr. Arnold Brody's Testimony*

¶ 23     Dr. Arnold Brody is currently a professor of molecular and biomedical sciences at North Carolina State University with a master's degree in anatomy and a doctorate degree in cell biology who previously participated in the university's toxicology curriculum. Dr. Brody testified as a controlled expert for plaintiffs. Dr. Brody opined that all types of asbestos can cause all of the asbestos-related diseases including mesothelioma, that it is the asbestos that escapes the product and is inhaled that causes the disease. Dr. Brody opined that, based on his research, chrysotile asbestos alone causes mesothelioma. Dr. Brody testified "we find chrysotile asbestos in the lungs of people decades after they've died." But, he noted the asbestos concentration in ambient air is small enough to breathe without risking disease. Dr. Brody also testified that he possessed no knowledge on the specific mechanics of wire products.

¶ 24                              *Regis Lageman's Testimony*

¶ 25     Regis Lageman testified on behalf of plaintiff as an adverse witness and also as defendant's corporate representative most knowledgeable on what defendant knew concerning asbestos's health risks. Lageman holds a bachelor of science degree in electrical

engineering from Johns Hopkins University and worked closely with defendant's cable and wire as he transitioned through the positions of specifications engineer, product engineer, and senior process engineer at Continental from 1967 to 1977. Lageman testified that the defendant is the entity responsible for all prior Anaconda and Continental products. He verified Continental produced some asbestos-containing wire until 1984. He testified that asbestos-containing wires were labeled "asbestos; varnish Cambric asbestos-insulated wire" on the spools. But, Lageman testified that the wires had no warning labels, because the company believed no dangerous fibers were released when cutting or stripping the wire. He testified that the defendant waited until the 1990s to test its asbestos-containing wire, because the defendant had no evidence fibers were being released prior to the 1990s asbestos lawsuit against Ericsson.

¶ 26    Lageman testified that U.S. Steel was a "big customer" of defendant's soaking pit wire, which was partially composed of asbestos. Lageman testified that the majority of asbestos used was chrysotile asbestos and used for soaking pits in steel mills. Each spool of soaking pit wire would contain nearly a mile's length of wire. Lageman acknowledged that the wire and cable that the decedent described that he stripped would have contained asbestos, but based on the same description, it was not wire that was sold by defendant. He testified that the defendant did not presently have records indicating where defendant had sent its asbestos-containing wire and cable.

### OSHA Regulations

¶ 28    The defendant attempted to introduce into evidence the asbestos regulations of the Occupational Safety and Health Administration (OSHA), claiming OSHA regulations showed the asbestos-containing wire did not require a warning label because the fiber it foreseeably released fell within the permissible exposure limit. Plaintiffs objected and the trial court excluded this evidence, citing that OSHA regulations apply only to employer-employee relationships, and since the decedent was not defendant's employee, OSHA regulations were irrelevant.

### Closing Arguments

¶ 30    During closing arguments, plaintiffs asked the jury to award damages within the range of $7 to $14 million. Plaintiffs then said, "It's a total win for this corporation if you don't come back with a substantial verdict. It's an absolute win." Defendant objected. After sustaining the objection, the trial judge admonished the jury by saying, "What is a win or a loss I think is irrelevant. What is relevant is if you find that the defendant is liable then the plaintiffs are entitled to be fairly [compensated] for their losses. Who wins or loses is not the issue here."

### ANALYSIS

¶ 32    On appeal, defendant contends that the trial court erred in denying its posttrial motions for judgment notwithstanding the verdict or, alternatively, for a new trial because (1) the

evidence established that the cable and wire the decedent worked with lacked asbestos; (2) plaintiff failed to establish that defendant's cable and wire was the cause of decedent's mesothelioma; (3) defendant was prejudiced by the exclusion of OSHA regulations; (4) defendant was prejudiced and deprived of a fair trial by plaintiff's improper statements during closing arguments; and (5) the trial court erred by allowing plaintiff's controlled expert, Dr. Steven Dikman, to testify that defendant's cable and wire was a contributing cause of the decedent's mesothelioma when that testimony was not disclosed under Illinois Supreme Court Rule 213.

¶ 33                                  Judgment Nothwithstanding the Verdict

¶ 34       The defendant first argues that the trial court's judgment must be reversed and a judgment should be entered in favor of defendant notwithstanding the jury verdict, claiming (1) that there was no evidence that defendant's cable and wire contained asbestos; and (2) that there was no evidence that the cable and wire caused mesothelioma and decedent's death.

¶ 35       Judgments notwithstanding the verdict are proper only where all the evidence viewed most favorably to the opponent so overwhelmingly favors the movant that no contrary verdict could ever stand. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses and to decide what weight should be given to the witnesses' testimony. *Maple*, 151 Ill. 2d at 452. On review of a trial court's decision to deny a motion for a judgment notwithstanding the verdict, all of the evidence must be reviewed in a light most favorable to the opponent of the motion. *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 353-54 (1992). A court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence and any inferences therefrom, in the light most favorable to the party resisting the motion. *Mizowek v. De Franco*, 64 Ill. 2d 303, 309-10 (1976). A judgment notwithstanding the verdict is not appropriate if "reasonable minds might differ as to the inferences or conclusions to be drawn from the facts presented." *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995).

¶ 36       In a cause of action for negligence or strict product liability arising from alleged exposure to asbestos, a plaintiff must prove that the defendant's asbestos was the cause in fact of the injury. *Thacker*, 151 Ill. 2d at 354. To prove causation in fact, the plaintiff must prove medical causation, *i.e.*, that exposure to asbestos caused the injury, and that it was the defendant's asbestos-containing product which caused the injury. *Thacker*, 151 Ill. 2d at 354.

¶ 37       To meet this burden, a plaintiff must show that the injured party was exposed to the defendant's asbestos through proof that "he regularly worked in an area where the defendant's asbestos was frequently used" and the injured party worked in sufficient proximity to this area so as to come into contact with the defendant's product. *Thacker*, 151 Ill. 2d at 359. This test is often referred to as the "frequency, regularity and proximity" or "substantial-factor" test.

¶ 38       This was a highly contested case and the jury verdict was based on who the jury believed was telling the truth. In the case at bar, the decedent testified that he worked with asbestos-

containing Anaconda wire from 1955 to 1984 at U.S. Steel. He drove a boom truck for the electric shop and performed maintenance functions which included repairing industrial wire, replacing burnt cables, pulling wire cable in and out of pipe conduit and transporting scrap cable to the salvage yard. The decedent's duties involved the cutting and stripping of electrical wires and cables. The decedent testified that the cutting and stripping of the wire and cable produced asbestos dust that he disposed of using a coal shovel at the end of each work day.

¶ 39    The wire and cable used at U.S. Steel were originally manufactured and sold by Anaconda, which stopped producing cable containing asbestos in the 1950s. Anaconda acquired Continental in 1974 and Continental manufactured cable containing asbestos from 1946 to 1984. Defendant acquired Anaconda in 1980.

¶ 40    Erich Kothe, an engineer employed by Anaconda from 1951 to 1986, testified on behalf of plaintiff, as defendant's corporate representative, in a videotape deposition. Kothe helped develop Anaconda's wire and cable products. Kothe testified that the first test defendant conducted concerning asbestos dangers occurred in the 1990s as a result of an asbestos lawsuit filed against the defendant. Defendant's lawyers had the test performed. The test result showed that some asbestos fibers were released into the air when wire from a reel labeled "Anaconda" was stripped. However, Kothe testified that when Anaconda sold varnish cambric cable that contained asbestos, it did not believe the product was hazardous because it contained saturated asbestos as opposed to raw asbestos. Kothe testified that the defendant knew its customers would cut and strip its wires, but that those actions released such small amounts of asbestos that it would not cause disease. The defendant never contemplated that someone would use a shredding machine. Kothe conceded that Anaconda's own corporate literature stated "Anaconda Continental." These brochures referenced asbestos-containing wire and were offered and received in evidence and published to the jury.

¶ 41    Regis Lageman, defendant's other corporate representative, testified on behalf of the plaintiff as an adverse witness that Continental made asbestos-containing wire in the 1970s and shipped it to steel mills. He testified that the defendant "comb[ed] the felted asbestos onto the wire" from 1967 to 1984. The defendant purchased 4 to 5 tons of asbestos annually starting in 1967, which was gradually reduced to zero by 1984. The type of asbestos used was 80% to 95% long-fiber chrysotile asbestos, which was better for wire creation. Lageman acknowledged that Continental's catalogues listed U.S. Steel as a customer and claimed that "U.S. Steel was a big customer for soaking pit cable," and that "part of the insulation system and part of the jacket is asbestos." Soaking pit cable, which contained some asbestos, was sold to U.S. Steel until 1984. He testified the company's asbestos-coated wire would be labeled "asbestos; varnish cambric asbestos-insulated wire" on the spools.

¶ 42    Further, Lageman testified that the wires contained no warning labels because the defendant believed that no dangerous fibers were released when the wire was cut or stripped. He testified that the defendant waited until the 1990s to test its wires that contained asbestos because it had no evidence that fibers were being released until it was made a defendant in a lawsuit.

¶ 43    The defendant, in its brief to this court, indicate that there was no evidence that the wire and cable shredded by the decedent and Scott contained asbestos and was sold to U.S. Steel by defendant. It based its argument on the following testimony of Lageman:

"Q. Mr. Lageman, did you read Mr. Campbell and Mr. Scott's depositions?

A. Yes, I have.

Q. And did you see their description of the cables that they worked with that they believed contained asbestos that would have been manufactured by Anaconda or Anaconda Continental?

A. Yes, I did review that in detail.

Q. Did they describe any Anaconda Continental wires or cables that would have ever had asbestos in their coverings?

A. Based on the descriptions that they gave in the depositions, there was no wire or cable that we've ever manufactured that I could have fit into that specification. There was a general indication of the wire but nothing specific enough for me to narrow down as to type.

Q. Did Continental or Anaconda Continental ever sell a cable that just had the name 'Anaconda' on the cable or the reel?

A. You're talking about the Anaconda Continental entity?

Q. Yes.

A. That just had Anaconda on it, no. The reels were not printed.

Q. So if Mr. Campbell identified an Anaconda-only cable, would that have been something that was manufactured by Continental or Anaconda Continental?
***

A. He indicated in his deposition that there was the word 'Anaconda' and sometimes the word 'asbestos' on a reel. At the Continental wire facility that became Anaconda which became Anaconda Ericsson, we did not surface print or paint a name on the reel because the reels were potentially reusable.

Q. And did Anaconda Continental ever sell any cable that just said 'Anaconda' on the reel?

A. No. That would have been incorrect. We were part of Anaconda, but we were the Anaconda Continental Division.

Q. And if Mr. Scott identified using Anaconda Continental cable in the 1960s, would that have been possible?

A. No. Anaconda Continental didn't exist as a legal entity until late 1973 or '74. Prior to that, we were actual competitors.

Q. You mentioned this a second ago, but did Anaconda Continental ever print the word 'asbestos' on its reels?

A. No. That wouldn't make sense. The reels were returnable and–
***

Q. If Mr. Scott or Mr. Campbell saw the word 'asbestos' on a wire and cable reel, would that have been an Anaconda Continental reel?

A. We never printed the word 'asbestos' on any cable.

\*\*\*

Q. How about on the reels?

A. The word 'asbestos' never appeared on the reels.

Q. Was Anaconda Continental able to print on the covering of a wire or cable that contained asbestos?

A. The short answer is no.

Q. All right, sir. If Mr. Scott or Mr. Campbell saw printing on a cable manufactured by Anaconda Continental, would the covering of that cable have contained asbestos?

A. No. At the time we're talking about manufacturing from '77 to '84, the asbestos cable was essentially braided so it was an uneven covering, and we weren't able to print on uneven coverings.

Q. Could you print on the smooth rubber or Neoprene coverings of the cables?

A. Yes. Any jacket that was smooth like rubber, Neoprene, PVC, we could print on with a print wheel.

Q. Did Anaconda Continental rubber or Neoprene, did it ever contain asbestos?

A. No, the compounds for the jacket did not."

Yet, Lageman acknowledged that the cable and wire the decedent described contained asbestos.

¶ 44 Raymond Scott, an electrician whose work duties involved handling wire and cable at U.S. Steel, beginning in the 1970s, essentially corroborated the decedent's testimony. Scott observed cable spools that read, "Asbestos Continental Cable Company." Scott testified that by stripping these cables dust was produced and that the workers who stripped these cables were exposed to this dust on a daily basis for years.

¶ 45 In viewing the evidence, defendant's argument that there was no evidence that any of the defendant's products used at U.S. Steel contained asbestos is without merit. Kothe, a corporate representative of defendant and the engineer primarily employed by Anaconda, a company the defendant purchased, verified the presence of asbestos on wire and cable, produced by Anaconda and later Continental, used at U.S. Steel. Regis Lageman, defendant's corporate representative, testified that Continental, a company acquired by defendant, manufactured wire and cable with asbestos. Defendant purchased 4 to 5 tons of asbestos annually starting in 1967, which was gradually reduced to zero by 1984 and defendant "comb[ed] the felted asbestos onto the wire" from 1967 to 1984. Lageman opined that from the testimony of the decedent and Scott, "there was no wire or cable that we've ever manufactured that I could have fit into that specification."

¶ 46 As a result, there was evidence that defendant's cable and wire contained asbestos during 1970 to 1984. The decedent and/or Scott described either Anaconda wire or Anaconda-

Continental wire with the word "asbestos" on its reels. The decedent testified it was even on the cable and its jacket. Lageman and Kothe testified that defendant never place the word "asbestos" on its cable, jackets, or reels. The jury heard the evidence and passed upon the credibility of the witnesses and believed the plaintiff's witnesses over Lageman and Kothe. The defendant produced no records to substantiate its claim that the wire and cable sold to U.S. Steel during decedent's tenure did not contain asbestos. But, most importantly, the decedent's testimony illustrated that he was constantly replacing wire and cable at the plant. A reasonable jury could have found from the evidence that some of that wire probably was decades old in origin and manufactured by defendant's companies with asbestos and that the decedent was exposed to that process for years. The other issue for the jury was whether the asbestos in the wire and cable caused the decedent's mesothelioma and subsequent death. On this issue the evidence was also sufficient to support the jury's verdict.

¶ 47    Defendant claims that the plaintiffs could not prove causation because no witness testified as to the quantity of asbestos fibers released when the decedent stripped the wires and cables. However, defendant does not cite any authority which would require this type of testimony, and the exactitude of providing the quantity of asbestos fibers released could be an impossibility because the exact amount of wire or cable stripped in a day probably varied and the amount of asbestos released into the atmosphere would also vary. In addition, the decedent did his shredding in an enclosed shanty where he testified he had difficulty in breathing and that the dust from the shredding process attached to his clothing and hair. There did not appear to be much of an atmosphere for the dust to release into. When a proponent of any argument fails to offer supporting legal authority or "any reasoned argument," the proponent of the argument waives consideration of the argument. *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006).

¶ 48    It appears that defendant's theory in this case is that the quantity of asbestos fibers released from the stripped wires and cable produces a small amount of asbestos dust that could not cause mesothelioma. However, though the defendant has no burden to prove anything, there was no expert testimony presented that supported defendant's position. It was plaintiff's burden to introduce sufficient evidence to establish that defendant caused the mesothelioma. *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 434 (2009).

¶ 49    The "substantial factor" test used to establish causation requires the defendant's conduct to be responsible for producing the plaintiff's injury. *Thacker*, 151 Ill. 2d at 355. As we previously explained, to determine if asbestos exposure is a substantial factor in causation, the "frequency, regularity and proximity" test may be used, which states that a plaintiff can show exposure to defendant's asbestos by proving that: (1) plaintiff "regularly worked in an area where the defendant's asbestos was frequently used"; and (2) the injured plaintiff worked "sufficiently close to this area so as to come into contact with the defendant's product." *Thacker*, 151 Ill. 2d at 359.

¶ 50    Because of the problems associated with proving one's present condition was caused by past exposure to a product, Illinois courts have not required a finding of the exact quantity of asbestos fibers a decedent was exposed to. *Thacker v. UNR Industries, Inc.*, 213 Ill. App. 3d 38, 40-41 (1991) (citing *Wehmeier v. UNR Industries, Inc.* 213 Ill. App. 3d 6 (1991)). Instead, the plaintiffs in asbestos cases must show "the frequency of the use of the product

and the regularity or extent of the plaintiff's employment in proximity thereto." (Internal quotation marks omitted.) *Wehmeier*, 213 Ill. App. 3d at 29.

¶ 51    In the case at bar, the decedent testified that he worked with Anaconda wire and cable containing asbestos from 1955 to 1984 at U.S. Steel. He was diagnosed with mesothelioma in March 2008. The decedent testified that he stripped cable every day and would take the scrap cable out to the salvage yard and use shredders to strip the cable. He would first shave off the insulation that covered the wires in the cable to save the copper core for salvage. His cable stripping work took place in a shanty where the shredding machine was located. During the shredding process, the shanty became so dusty that he "couldn't breathe." The dust from the cable shredding would cover him from head to toe, and the dust attached onto his clothes and hair. In addition, the decedent testified that as part of his maintenance duties he would repair industrial wire, which involved stripping the wire and installing lug nuts and cleaning the end of the cable with a knife when the cable burned up, and again removing the insulation. These processes also created dust as well. When decedent pulled the wires and cable through conduit, dust was also created because debris would accumulate in the conduit and created dust when the cable was pulled. In addition, Kothe testified that in the pulling process the casings on the cable can be damaged. Dr. Dikman's testimony in a hypothetical question, which included the evidence most favorable to the plaintiff, produced sufficient evidence of causation. Dr. Dikman opined that the decedent's exposure to the asbestos wire and cable "would be a contributing factor, a cause." Dr. Dikman also testified that the exposure to asbestos can be found in the lung area 50 years after exposure. Dr. Brody confirmed that evidence of asbestos exposure can be found in dead people decades after their deaths. Asbestos exposure can take many years before the disease is diagnosed. The disease and the cause of death here are not disputed.

¶ 52                                    Motion for a New Trial

¶ 53    Next, we must determine whether the trial court erred in denying defendant's motion for a new trial. "If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial." *Maple*, 151 Ill. 2d at 456. A court's ruling on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion. *Maple*, 151 Ill. 2d at 455.

¶ 54    In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. *Maple*, 151 Ill. 2d at 455. A verdict is contrary to the manifest weight of the evidence only when the opposite conclusion is clearly evident or the verdict is unreasonable, arbitrary, and not based on the evidence. *Bosco v. Janowitz*, 388 Ill. App. 3d 450 (2009). We have already discussed that the jury verdict was supported by the evidence and we cannot say that an opposite conclusion is clearly evident or that the verdict is unreasonable, arbitrary, and not based on the evidence. Therefore, we will consider whether any of defendant's claims of error entitles it to a new trial.

¶ 55    In the case at bar, the trial court barred defendant from introducing evidence that the defendant was in compliance with OSHA regulations. The defendant indicated that it desired to call Dr. Victoria Argento, a professional engineer. The trial court barred defendant from showing that it complied with OSHA regulations finding such evidence applied only to employer-employee relationships and was thus irrelevant and immaterial. The defense advised the trial court that it would prepare a stipulation to be used as an offer of proof, but never presented the stipulation or an offer of proof in any other form. However, while the jury was deliberating, the defendant filed a motion *in limine* on the subject matter, and the trial court sustained plaintiff's objection to its timeliness.

¶ 56    Raymond Scott, the electrician, corroborated decedent's testimony that by stripping the cables, dust was produced and that the workers who stripped these cables were exposed to the dust on a daily basis.

¶ 57    Erich Kothe, the engineer employed by Anaconda, corroborated plaintiff's claim that asbestos fibers were released into the air when Anaconda wire was stripped. Regis Lageman, defendant's corporate representative, admitted that defendant is responsible for Anaconda's and Continental's wire that contained asbestos.

¶ 58    Plaintiff's retained expert, Dr. Steven Dikman, a pathologist, testified in a hypothetical question that since the decedent had worked around asbestos materials for many years that were manufactured by the defendant and had inhaled dust containing asbestos, defendant's products would have been a contributing cause of his mesothelioma and death.

¶ 59    In addition, plaintiff's second retained expert, Dr. Arnold Brody, who holds a Ph.D. in cell biology and is currently a professor of molecular and biomedical sciences, opined that all types of asbestos, including chrysotile asbestos, cause mesothelioma. Dr. Brody rejected defendant's claim that people cannot breathe in chrysotile asbestos, the type used in defendant's products, as "nonsense." Defendant presented no expert witnesses.

¶ 60    There was more than sufficient evidence for the jury to find that the decedent was exposed to defendant's cable and wire containing asbestos and that the asbestos fumes he was exposed to was a cause of his mesothelioma and death.

¶ 61                              OSHA Regulations

¶ 62    On appeal, defendant claims that the trial court abused its discretion by excluding evidence of OSHA's asbestos regulation and as a result Ericsson was prejudiced by its inability to use the regulation to show that any fiber released was within permissible exposure limits.

¶ 63     When a motion *in limine* is granted or when an objection is sustained barring the use of intended evidence, "the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *Snelson v. Kamm*, 204 Ill. 2d 1, 23 (2003). An offer of proof informs the trial court, opposing counsel, and the reviewing court of the nature and substance of the evidence sought to be introduced. *K4 Enterprises, Inc. v. Grater, Inc.*, 394 Ill. App. 3d 307 (2009).

¶ 64    As an initial matter, since defendant did not present an offer of proof or to what

regulations it wanted to offer, it waived the issue. However, it tells us in its brief what it intended to offer and if that had been preserved our decision would still be to affirm the trial court on this issue.

¶ 65    The trial court has sound discretion when determining the admissibility of evidence, and its decision will not be overturned on appeal absent a clear abuse of discretion. *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 929 (1998). "A trial court abuses its discretion only when no reasonable person would agree with its decision." *Simich v. Edgewater Beach Apartments Corp.*, 368 Ill. App. 3d 394, 411 (2006) (citing *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003)).

¶ 66    Defendant claims that OSHA's asbestos regulation applies to manufacturers and therefore, the trial court erred in finding that it applies only to the employer-employee relationship. However, defendant cites no case law that identifies instances where the OSHA asbestos regulation was applied to a manufacturer.[2] Conversely, the plaintiffs cite cases from several other jurisdictions that held manufacturers, who are not employees, are not regulated under OSHA. See *Merritt v. Bethleham Steel Corp.*, 875 F.2d 603 (7th Cir. 1989); *Jeter v. St. Regis Paper Co.*, 507 F.2d 973 (5th Cir. 1975); *Johnson v. Koppers Co.*, 524 F. Supp. 1182 (N.D. Ohio 1981); *Cochran v. International Harvester Co.*, 408 F. Supp. 598 (W.D. Ky. 1975).

¶ 67    Moreover, OSHA's asbestos regulation under 29 C.F.R. § 1910.1001 (2009) references only the duties that an employer has to his employee, not the duties of a manufacturer. For example, section 1910.1001(c) states that the "employer shall ensure that no employee is expose to an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air." 29 C.F.R. § 1910.1001(c). "Employers who are manufacturers" are discussed in the OSHA asbestos regulation; however, section 1910.1001(j)(5) clarifies that employers who are manufacturers of asbestos products must comply with OSHA's hazard communication standard at section 1910.1200(g) as opposed to the OSHA asbestos regulation that Ericsson sought to admit into evidence.

¶ 68    Under 29 C.F.R. §§ 910.2(c) through (d) (2010), OSHA defines employer as "a person engaged in a business affecting commerce who has employees" and employee as "an employee of an employer who is employed in a business of his employer which affects commerce." Since decedent worked for U.S. Steel, it would be considered the decedent's employer, not defendant. Therefore, the OSHA asbestos regulations would speak only to the relationship between U.S. Steel and the decedent.

¶ 69    Since the OSHA asbestos regulations do not apply to defendant, evidence of the regulations is irrelevant, and therefore, its exclusion was proper and not prejudicial to the defendant. We cannot say that no reasonable person would agree with the trial court.

---

[2]The cases cited by defendant speak to manufacturer negligence generally, but do not pertain to OSHA specifically. *Gelsumino v. E.W. Bliss Co.*, 10 Ill. App. 3d 604 (1973); *Moren v. Samuel L. Langston Co.*, 96 Ill. App. 2d 133 (1969).

## Improper Closing Argument

On appeal, defendant claims that the trial court erred in failing to grant a new trial, because plaintiffs improperly referenced defendant's corporate wealth in closing arguments. Specifically, after plaintiffs asked the jury to award damages within the range of $7 to $14 million, plaintiffs said, "It's a total win for this corporation if you don't come back with a substantial verdict. It's an absolute win."

Attorneys are afforded wide latitude during closing argument and may comment and argue on the evidence and any inference that may be fairly drawn from that evidence.

Improper comments by counsel constitute reversible error only where the comments are so prejudicial as to deprive the other party of the right to a fair trial. Issues concerning the prejudicial effect of comments made during closing argument are within the sound discretion of the trial court, and determinations regarding such issues will not be reversed absent a clear abuse of discretion.

In determining whether there has been an abuse of discretion we may not substitute our judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely. *Chakos v. Illinois State Toll Highway Authority*, 169 Ill. App. 3d 1018, 1029 (1988).

Improper closing arguments require reversal only when the comments resulted in substantial prejudice to the opposing party. *Ramirez v. City of Chicago*, 318 Ill. App. 3d 18, 26 (2000). However, generally, when an improper statement is made, if "the trial court sustains a timely objection and instructs the jury to disregard the improper comment, the court sufficiently cures any prejudice." *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 862 (2008).

Accordingly, the trial judge's timely response here to the plaintiffs' closing statement effectively cured any prejudicial effect it may have generated. Following defendant's immediate objection, the trial judge sustained the objection and admonished the jury by saying, "What is a win or a loss I think is irrelevant. What is relevant is if you find that the defendant is liable then the plaintiffs are entitled to be fairly [compensated] for their losses." In immediately instructing the jury to disregard plaintiffs' improper statement, the trial court took the necessary steps to ensure defendant a fair trial. Therefore, the trial court was within its discretion to deny defendant's motion for a new trial on the ground of an improper closing statement, because any prejudicial effect from the improper statement was cured.

## Illinois Supreme Court Rule 213 Disclosure

On appeal, defendant claims that the trial court erred by failing to exclude Dr. Dikman's testimony when his Rule 213 disclosure did not indicate he would testify that plaintiff's exposure to the asbestos in Ericsson's wires and cables was a cause that contributed to the decedent's mesothelioma. Defendant claimed Dr. Dikman's Rule 213 written disclosure did not give adequate notice of his testimony because it did not contain any mention or show any understanding of wire and cable.

The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial

court and the court's ruling will not be disturbed absent an abuse of discretion. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties. *Sullivan*, 209 Ill. 2d at 109.

¶ 80    However, the failure to comply with Rule 213 does not automatically require the exclusion of the noncomplying party's witnesses or testimony. Our supreme court has held that in determining whether the exclusion of a witness or testimony is a proper sanction for nondisclosure, the court "must consider" the following factors: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. *Sullivan*, 209 Ill. 2d at 110.

¶ 81    First, we must determine whether there was a violation of Rule 213. Dr. Dikman's deposition was not taken by defendant in this case and defendant had the right to take his deposition to determine all of his opinions.[3] However, plaintiff filed a Rule 213(f) written disclosure which stated in part:

> "Dr. Dikman is expected to testify by hypothetical question as to concepts such as latency and injury and causation.
>
> * * *
>
> Dr. Dikman is further expected to be able to testify concerning the circumstances under which exposure to asbestos may be associated with mesothelioma, and will testify concerning the results of his own experiences, the medical and scientific literature, and existing epidemiologic studies concerning associations between exposure to asbestos and the mortality and/or incidence of some forms of cancer.
>
> * * *
>
> Dr. Dikman is also expected to testify as to the specific requirements necessary for an exposure to be considered a 'substantial contributing factor.' Dr. Dikman will also testify as to hypothetical exposures based on the history of the plaintiff's exposure to asbestos and the potential of those exposures to cause [mesothelioma. The hypothetical questions will be based upon the product identification deposition and evidentiary deposition of plaintiff, as well as answers to interrogatories of defendants for asbestos-containing products."

¶ 82    Defendant claimed a Rule 213 violation after Dr. Dikman was asked the following question:

> "Q. Doctor, I want to ask you this question. Dr. Dikman, the Jury has heard the testimony of Mr. Richard Campbell. I want you to assume that Mr. Campbell worked with industrial-size Anaconda and Continental asbestos-containing wire and cable starting in 1974 and going through into 1984 while at U.S. Steel. I want you to further assume that Mr. Campbell and others in close proximity to him performed the following activities, cut this wire and cable, skimmed this wire and cable to make connections, and fed this wire and cable through a stripping machine which created

---

[3]Dr. Dikman's deposition was taken in the Scott case.

visible dust which was swept up. [He] and others in close proximity to him performed all of these activities on a regular and continuous and frequent basis. Dr. Dikman, I want you to further assume that based on Ericsson corporation's sworn interrogatory answers, corporate representative testimony, Ericsson's documents, and Ericsson's corporate admissions that there is asbestos-containing wire released as asbestos fibers when cut and stripped. I further want you to assume that this process created dust that he saw with his own eyes, that the dust got on his clothes, in his hair, and in his car, that he breathed that dust into his lungs on a regular and continuous and frequent basis for many years.

Doctor, based on your medical training, scientific, and medical experience and research, in particular your training and experience with asbestos-related diseases, do you have any expert opinion regarding whether Mr. Richard Campbell's occupational exposure to the Anaconda and Continental wire and cable was a cause that contributed to his mesothelioma in addition to other occupational asbestos exposures?

DEFENSE COUNSEL: Your Honor, objection, foundation, improper hypothetical, and Rule 213.

THE COURT: Sidebar. I'm sorry. Before we do that, foundation and relevancy? Did we discuss the 213 aspect–

DEFENSE COUNSEL: We did, your Honor.

THE COURT: –or are you raising that for the first time right now?

DEFENSE COUNSEL: It's not being raised for the first time.

THE COURT: Pardon?

DEFENSE COUNSEL: I'm raising it, your Honor, yes, but–

THE COURT: Did we discuss that last week?

DEFENSE COUNSEL: We did discuss I think Rule 213.

THE COURT: And I ruled on it. Then I'll overrule your objection at this time based upon my rulings on Motions in Laminae [*sic*]; that means motions that were heard before the commencement of the trial. You may answer, Doctor.

WITNESS: Yes, that exposure would be a contributing factor, a cause."

¶ 83    At the time of defendant's motion *in limine* to bar Dr. Dikman's testimony, defendant made the following objection after plaintiff started the hypothetical question at issue here.

"DEFENSE COUNSEL: Yes, your honor, we have an objection based upon 213. We do not think that we were adequately disclosed of the opinions, the factual basis for the opinions, and the conclusions of Dr. Dikman in the Scott and Campbell cases. So yes, we have an objection as we have disclosed a number of times before."

¶ 84    The crux of defendant's objection was the use of the words, "exposure to Anaconda wire and cable was a contributing cause of [plaintiff's] disease."

¶ 85    We believe that plaintiff's written disclosure adequately disclosed what Dr. Dikman answered in the hypothetical question. The exact words that were used in the question and

answer need not be specifically set out in a written disclosure when the subject matter is adequately disclosed in written discovery. Defendant chose not to take the doctor's deposition when it had the right to do so to discover with exactitude what he was going to say.

¶ 86 However, even if we found a Rule 213 violation, we would still find that the trial court did not abuse its discretion in overruling defendant's objection by utilizing the six *Sullivan* factors.

¶ 87 First, there was no surprise to defendant. It had Dr. Dikman's Rule 213(f) written disclosure that indicated that the witness would testify to a hypothetical question to determine causation. It knew that a proper hypothetical question had to be based on the evidence and that plaintiff's evidence disclosed decedent's exposure to cable and wire manufactured by defendant for a long period of time that contained asbestos. It knew that the witness had opined that all types of asbestos cause mesothelioma. It took Dr. Dikman's deposition in the Scott case, which was a similar case, and was well aware of his opinions. Defendant knew that Dr. Dikman had traveled throughout the country testifying in asbestos cases for plaintiffs and finding causation in similar cases.

¶ 88 Second, Dr. Dikman's testimony was not a surprise and therefore not prejudicial to defendant as the witness was disclosed as a controlled expert who would render a positive opinion on causation from a hypothetical question. It further knew from the hearing on its motion *in limine* to bar, before the trial, the scope of the question that plaintiff was going to ask and made no attempt to obtain testimony from a controlled expert on its own behalf to counter Dr. Dikman's testimony. In addition, it knew the trial court was going to allow the hypothetical question prior to trial, when its motion *in limine* was denied.

¶ 89 Third, defendant knew that Dr. Dikman was a controlled expert who would opine on the asbestos or effects of asbestos and its causation to plaintiff's mesothelioma. The fact that the written disclosure did not use the words "wire and cable" was not a substantial deviation from what was given to defendant in the disclosure.

¶ 90 Fourth, there was a lack of diligence on the part of defendant in not taking Dr. Dikman's deposition and in not obtaining its own controlled expert to counter his opinions. Fifth, the objection by the defendant was timely, and sixth, we cannot say that the party calling the witness was not in good faith, as all of the facts indicate good faith.

¶ 91 We cannot find that the trial court abused its discretion in denying defendant's motion *in limine* and later in overruling defendant's objection to the hypothetical question asked to Dr. Dikman.

¶ 92                                         CONCLUSION

¶ 93 The trial court properly denied defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The OSHA regulations were properly excluded, any improper statements during closing arguments were cured by the trial court and no prejudice resulted, and plaintiff did not violate Illinois Supreme Court Rule 213.

¶ 94        Affirmed.