2025 IL App (1st) 231830

Nos. 1-23-1830 and 1-24-0436 (cons.)

First Division
June 16, 2025

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| MAUREEN WALSH, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee and Cross-Appellant, | ) | |
| | ) | No. 19 L 261 |
| v. | ) | |
| KEITH D. SKLAR, DPM, and FOOT FIRST PODIATRY CENTERS V, P.C., a Domestic Corporation, d/b/a Foot First Podiatry, | ) | Honorable Bridget J. Hughes, |
| Defendants-Appellants and Cross-Appellees. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1 This appeal stems from a medical negligence claim, where, following a jury trial, a judgment was entered on a jury verdict in favor of plaintiff-appellee Maureen Walsh and against defendants-appellants Keith D. Sklar, DPM, and Foot First Podiatry Centers V, P.C. (Foot First Podiatry) for $2,865,495. On appeal, defendants argue that (1) the trial court abused its discretion

in denying the defendants' posttrial motion and (2) the trial court abused its discretion in allowing the testimony of plaintiff's billing witness. Additionally, plaintiff appeals the trial court's approval of defendants' appeal bond for stay of the judgment, arguing that the amount is insufficient and the court should have imposed additional conditions. For the reasons that follow, we affirm the trial court's judgment entered on the jury's verdict where it did not abuse its discretion in denying the motion for a new trial or in allowing plaintiff's billing witness to testify. As to the appeal bond, we find an abuse of discretion as the trial court failed to comply with Illinois Supreme Court Rule 305(a) (eff. July 1, 2017). Should defendants intend to seek further review in the supreme court, this cause is remanded for the limited purpose of reconsideration of the appeal bond in accordance with Rule 305(a).

¶ 2                                                  I. BACKGROUND

¶ 3      On January 9, 2019, plaintiff instituted this action against defendants, alleging negligent podiatric care between December 2016 and June 2017. On March 13, 2023, plaintiff filed a motion to amend her complaint, which the trial court granted. In the first amended complaint, filed on March 16, 2023, plaintiff alleged the following.

¶ 4      One December 13, 2016, plaintiff, who had been previously diagnosed with osteoporosis and Type 1 diabetes, visited Foot First Podiatry for an appointment with Dr. Samantha Sklar, Dr. Keith Sklar's daughter. On December 28, 2016, plaintiff again visited Foot First Podiatry, and Dr. K. Sklar discussed with her both conservative treatment and surgical correction. On January 12, 2017, Dr. K. Sklar performed surgery on plaintiff's left foot, which involved the following procedures: (1) modified transpositional osteotomy with cheilectomy and A.O. internal screw fixation; (2) oblique proximal closing wedge osteotomy of the hallux with screw fixation; (3) Z-plasty tenotomies with sequential release of the second, third, and fourth extensor apparatus and

metatarsal phalangeal joints; and (4) arthroplasty fifth digit. After the surgery, she had multiple postoperative follow-ups with Dr. S. Sklar. On February 9, 2017, Dr. K. Sklar performed surgery on plaintiff's right foot this time, identical to the January 2017 surgery. She visited Foot First Podiatry multiple times in February 2017 for follow-up appointments where she complained of foot pain, and Dr. S. Sklar informed her that the pain was normal. On February 23, 2017, Dr. K. Sklar removed screws on plaintiff's left foot. In June 2017, plaintiff had an appointment with Dr. K. Sklar, during which she complained of constant, chronic pain in her feet, and more hardware was eventually removed.

¶ 5    Plaintiff alleged that, as a result of these surgeries, she remained in constant pain and required more surgeries. She also experienced "limitations on her mobility," "reduced tolerance for normal activities such as cooking, driving, walking, grocery shopping, and other activities[,]" and "lifestyle changes" to her life and job. Plaintiff alleged "negligence - healing arts malpractice" against Dr. K. Sklar (count I), "negligence - healing arts malpractice" against Dr. S. Sklar (count II), and vicarious liability against Foot First Podiatry (count III).

¶ 6    Prior to trial, defendants filed several motions *in limine* to bar (1) Dr. Milap Patel's standard of care testimony, (2) cross-examination with reference to inadmissible standard of care opinions, and (3) plaintiff's claim for billed medical damages and to strike the trial subpoenas for billing personnel.

¶ 7    On March 23, 2023, during the hearing on those motions, plaintiff's counsel agreed that Dr. Patel's testimony on standard of care would not be referenced or used during cross-examination. As to plaintiff's billing witness and the failure to identify that person by name in the Rule 213 disclosures, defendants argued this was an inadequate disclosure. In response, plaintiff stated that a subpoena had been sent to Northwestern Memorial Hospital (Northwestern) for a

billing witness; however, "[t]he issue is identifying someone from the billing department at Northwestern doesn't necessarily mean that would be the person that they're going to send in when I send a trial subpoena." The court then stated: "I would not necessarily bar you from doing this because you didn't name the individual. I appreciate that. But you still have to get *** past your foundation, and show that [they are] qualified to give this opinion." There was also a discussion regarding obtaining an affidavit from the billing person in advance of trial, and defendants' counsel stated: "We don't need to decide this now. I will ask at the time to be allowed to *voir dire* this witness outside the presence of the jury, since we didn't have any disclosure of his or her qualifications in advance."

¶ 8     Just prior to trial, on plaintiff's motion, Dr. S. Sklar was voluntarily dismissed as a defendant in the lawsuit. The trial began on March 27, 2023.[1] Prior to opening statements, the court instructed the jury that "[w]hat the lawyers say in opening statement is not evidence."

¶ 9     During opening statements, and as relevant here, plaintiff's counsel stated that Dr. Patel's testimony will be "that [plaintiff] did not need an osteotomy, because he's going to tell you that he looked at her x-rays, her presurgery x-rays from her first visit when she went to Foot First Podiatry Center" and "that she had a normal foot by x-ray when she presented at Foot First Podiatry Center."

¶ 10    Then, defendants' counsel, in their opening statement, stated: "And Counsel said to you inaccurately that Dr. Patel is going to say, [']This is all the fault of Dr. Sklar.['] He says no such thing. And I know he's going to testify about this because we've already taken his testimony."

¶ 11    After opening statements, plaintiff presented the following evidence to the jury.

---

[1] Exhibits introduced to the jury at trial were not included in the record.

¶ 12    Plaintiff testified that she is a planning consultant for a financial firm, which previously required her to travel in the Chicagoland area regularly. She was diagnosed with Type 1 diabetes when she was 12 years old, and she also has osteoporosis. She began seeing Dr. Sink after blisters started forming on her feet whenever she wore heeled shoes or flat dress shoes. Dr. Sink diagnosed her with mild bunions, and on Dr. Sink's advice, plaintiff wore gym shoes most of the time to avoid blisters. Dr. Sink suggested she consider a bunionectomy "if it got worse," but Dr. Sink also explained that it was an invasive procedure that would require plaintiff to be off her feet for 8 to 12 weeks. Plaintiff heard on the radio advertisements from Foot First Podiatry, claiming that its procedure was less invasive and had a faster recovery time, which was plaintiff's biggest concern when considering a bunionectomy.

¶ 13    Plaintiff visited Dr. S. Sklar at Foot First on December 13, 2016. At that visit, she spoke with Dr. S. Sklar about issues with her feet, Dr. S. Sklar showed her a video of the bunion surgery, and Dr. S. Sklar informed her that if she wanted to move forward, the next step would be to meet with Dr. K. Sklar. Her meeting with Dr. S. Sklar lasted about 15 minutes, and plaintiff did not recall any discussion of conservative care, such as shoe inserts or orthotics, as opposed to surgery. Additionally, no measurements or X-rays were taken at that visit.

¶ 14    During her second visit to Foot First Podiatry, plaintiff met with Dr. K. Sklar. At that visit, measurements and X-rays of her feet were taken. She and Dr. K. Sklar discussed the surgery and reviewed the potential complications. Her understanding was that the surgery would "correct the bunion and shorten [her] toe[,]" although she did not have any complaints about her big toe at the time. She hoped that the surgery would stop the formation of blisters and that afterwards she would be able to wear shoes other than gym shoes. After that visit, she agreed to Dr. K. Sklar's recommended surgeries. She was under the impression, prior to surgery, that it would be "less

invasive" with a "shorter recovery time," as Dr. K. Sklar stated that "some people make dinner the same day."

¶ 15    The first surgery on her left foot took place in a surgical room at Foot First Podiatry. Afterwards, she felt fine because there "was a lot of numbing in the foot" and she had pain medication. However, each day the pain and swelling her foot were worse and "[i]t felt *** like there was pressure on [her] foot. Like there was a band wrapped around [her] foot and [her] toe, and it was like a numbing sensation." She was instructed that after surgery she needed to keep her foot elevated, to ice it on and off, and to not stand on her feet longer than 10 minutes every hour. Three days later, she returned to Foot First Podiatry and, when they removed the bandage, she "noticed how large [her] toe and [her] foot had become." She testified that, in the postoperative period, the pain in her left foot never went away. At the second visit after the surgery, she asked "if it was common to have that much swelling postoperative, and they said no, but it can happen." Dr. K. Sklar then administered steroid shots, which made her foot "feel a little better for a short time and raised my blood sugar really high." She continued to follow Dr. K. Sklar's postoperative recommendations, but there was no improvement in her symptoms.

¶ 16    The second surgery, which was on her right foot, "[s]eemed to go fine." Plaintiff testified that she had the same postoperative experience on her right foot, with constant pain, soreness, and swelling. She also received steroid shots in her right foot. Later, Dr. K. Sklar performed another surgical procedure to remove a screw from her toe. She continued under Dr. K. Sklar's care for another five or six months, and at no point during that time was she ever pain-free. After six months, both of her big toes "started to hammer where they started to raise up *** and not touch the floor," and Dr. K. Sklar recommended she have surgery to fix her hammertoe and directed her to Weil Foot and Ankle Institute (Weil Institute).

¶ 17    When she visited the Weil Institute, her "pain was very high" and wearing shoes "really hurt." She visited Dr. Michael Buck at the Weil Institute in December 2017. Dr. Buck ultimately performed surgical procedures on plaintiff's feet involving fusion of the big toes on each foot and the removal of hardware "because at one point, the hardware came out underneath [her] toenail." Plaintiff stated that these procedures helped "[a] little bit." After the surgery, she was having pain in the bottom of her foot and Dr. Buck diagnosed her with plantar fasciitis, treated her with steroid injections, and recommended physical therapy. Plaintiff followed his recommendation for physical therapy, but while in therapy, she fractured her toe, requiring her to wear a surgical boot again.

¶ 18    In September 2018, plaintiff stopped seeing Dr. Buck and visited Dr. Patel, an orthopedic surgeon, for treatment. At this point in time, "all [her] other toes started to hammer underneath" so she could "barely walk." During her first visit with Dr. Patel, he took X-rays of her feet, examined her feet, and noticed that she had another fracture in one of her feet. He advised plaintiff to stay off her feet until the fracture healed and then he would reevaluate. She visited Dr. Patel again in December 2018. Eventually, Dr. Patel performed surgical procedures on each foot separately, which involved correcting the hammer toes and replacing bone in her foot with a bone graft from her ankle. Eight weeks after the second surgery, plaintiff was able to go to work and drive, but she still could not engage in any physical activity. Plaintiff completed 12 weeks of physical therapy, after which her pain was only moderate. She was later provided custom orthotic inserts for her shoes. Plaintiff continued to see Dr. Patel, who, at some point, removed hardware from her feet, and then in December 2021, during another surgery, he inserted a plate and metal screws into her right foot. In 2022, plaintiff received a second pair of orthotics, and Dr. Patel continued to monitor her recovery. The last surgery took place on February 20, 2023, during which Dr. Patel removed the hardware from plaintiff's right foot.

¶ 19    Plaintiff testified that she remains in mild to moderate pain every day, she can only wear gym shoes and can only walk for around 45 minutes to an hour, whereas previously she could walk all day. Plaintiff also testified that, when filling out a form during one of her initial visits to Foot First Podiatry, she indicated that her level of pain in her feet was a 2 out of 10, and on the day of trial, she testified that her level of pain was a 4 on her left foot and a 7 on her right foot.

¶ 20    On cross-examination, plaintiff confirmed that she was informed prior to her initial surgeries that there was a chance that a bunion could reoccur after the bunionectomies. She also confirmed that since Dr. K. Sklar's surgeries, she has not had any blisters or abrasions where her bunions used to be.

¶ 21    Dr. Bruce Dobbs, a doctor of podiatric medicine, testified as plaintiff's expert witness for the podiatric standard of care and causation. Dr. Dobbs testified that the "standard of care" is "more or less what a reasonable or competent *** podiatrist would do using their knowledge and skill to treat patients that come to see us." In forming his opinion, he reviewed the records from Dr. Sink, Foot First Podiatry, Dr. Michael Buck, and Dr. Patel, and the depositions of Dr. S. Sklar, Dr. K. Sklar, Dr. Buck, Dr. Patel, and plaintiff, as well as most, if not all, of the X-rays taken throughout plaintiff's treatment from these doctors. Dr. Dobbs explained to the jury that "a bunion is a bump of bone on the big toe caused by many reasons" and "just because you have a bump on your foot doesn't mean that it's a problem." As a result of his review, Dr. Dobbs opined that "Dr. [K.] Sklar did not comply with the standard of care with his surgical treatment of [plaintiff]" and that the "transpositional osteotomy with cheilectomy" surgery, the "oblique closing wedge osteotomy" surgery, and the surgical release of the "extensor tendons of toes 2, 3, and 4" on both feet were all unnecessary surgeries and were deviations from the standard of care. He testified that those unnecessary surgeries resulted in "destabilized" feet and "[t]he big toe was shortened, which

creates a whole bunch of problems." In particular, as to the big toe, he testified that that surgery "move[d] the forces of the foot as we walk away from the big toe to the other metatarsals, which is called transfer metatarsalgia." Also, when the extensor tendons on the other toes were cut, "it gave an unfair advantage to the flexor tendons, which are the underneath tendons, which also destabilized the toes ***, which Dr. Patel eventually had to fix by fusing the toes."

¶ 22 He further explained that when an individual has Type 1 diabetes like plaintiff, they "oftentimes don't heal as well" and "you need to be treated more conservatively and realize that whatever we do *** for any diabetic *** is a potential problem when you are doing surgery on them." He testified that, in diagnosing and treating bunions, "the x-rays are important" because they "will tell us, because we measure angles, what we want to do to fix the person's foot," *i.e.*, whether it is necessary to break the toe bone to fix the bunion. Dr. Dobbs also confirmed that the intermetatarsal angle (IM angle) is the "most widely accepted method in podiatric medicine for diagnosing the severity of a bunion in a patient." He testified that "anything below 10 degrees does not need a bone cut" and conservative care, such as a change of shoes, the addition of orthopedic inserts, or foot pads, would be recommended. For surgical treatments of bunions, Dr. Dobbs testified that if the angle is small, "we can cut the bone at the head of the bone" and "take the bump off" but that "works up until a certain degree" However,"[i]f the angle is large, *** it requires that you break the bone and move it—the first metatarsal closer to the second metatarsal."

¶ 23 Regarding plaintiff's treatment, Dr. Dobbs testified that Dr. K. Sklar broke two different bones to fix her bunion, and according to Dr. K. Sklar's records, her IM angles when she was initially seen on December 28, 2016, were a 5-degree angle on the left foot and an 8-degree angle on the right foot. Dr. Dobbs agreed with Dr. K. Sklar's measurements and testified that those angles were normal. The transpositional osteotomy that Dr. K. Sklar performed on plaintiff meant

that "the bone [was] broken at the head of the bone and moved closer to the second metatarsal bone," and Dr. Dobbs testified that plaintiff did not need that. When shown presurgery photographs of plaintiff's feet, Dr. Dobbs stated that her feet were "[r]elatively normal" and he did not "see a major problem" with the bunions on either of her feet. When shown presurgery X-rays of plaintiff's feet, Dr. Dobbs testified that a modified transpositional osteotomy was not indicated because there was "no room" to move the big toe closer to the second toe. According to Dr. Dobbs, the oblique proximal closing wedge osteotomy which Dr. K. Sklar performed on plaintiff was also not indicated and was a deviation from the standard of care. Dr. Dobbs testified that a tenotomy is the cutting of a tendon, and a z-plasty tenotomy with sequential release of the second, third, and fourth toes means that "the tendon is cut in a z fashion *** in order for the toe to flatten out." He further testified that this is done "if the toe is really contracted" and he did not see "any contracture" of plaintiff's second, third, or fourth toes. He testified that there was "no need to do those procedures" and "by doing them, they destabilized her foot to the extent that she needed additional surgery by Dr. Patel." He also testified that plaintiff, based on his review of the records, never complained about pain in any of those toes and the tenotomies were a deviation from the standard of care. Dr. Dobbs explained that a cheilectomy is "taking a bump off" on the first metatarsal and it can be performed without breaking bones or using screws. According to Dr. Dobbs, plaintiff presented to Dr. K. Sklar with a "pretty small bump, which you really can't see on the x-ray" and a cheilectomy would have resolved plaintiff's blisters.

¶ 24    In regards to plaintiff's treatment after Dr. K. Sklar's surgeries, Dr. Dobbs testified that Dr. Buck "straightened" the big toes on both feet by fusing them, but "[t]hat didn't work out well" and Dr. Patel "end[ed] up doing *** I think over a dozen procedures on [plaintiff] over I think four operative settings to try to salvage her foot and make it work better and feel better." He further

testified that, because plaintiff had osteoporosis, she had an increased chance of a failed fusion, but he did not think that Dr. Buck contributed to plaintiff's injuries. According to Dr. Dobbs, "[i]t was inevitable that [plaintiff] would have more surgery" after Dr. K. Sklar's treatment.

¶ 25    On cross-examination, Dr. Dobbs agreed that the surgeries performed on plaintiff are "recognized podiatric procedures" for the correction of bunions and treatment of hammertoes. He also agreed that Dr. Sink diagnosed plaintiff with moderate bunions on both feet. He further agreed that Dr. Buck answered in his deposition that he did not have any issues with the care provided by Dr. K. Sklar. On redirect examination, Dr. Dobbs testified that he would not have diagnosed plaintiff with moderate bunions, only mild bunions.

¶ 26    Dr. Patel's video-recorded evidence deposition was then played for the jury. In the deposition, Dr. Patel testified as follows. Dr. Patel is an orthopedic surgeon practicing at Northwestern in Chicago. He first saw plaintiff on September 26, 2018, and she complained of bilateral toe pain and lateral foot pain at that time. Before resorting to surgery, Dr. Patel recommended conservative treatment to plaintiff. After three months of conservative treatment, plaintiff still had pain in her left foot. Dr. Patel testified that plaintiff's problems with her left foot were that the first toe joint fusion had failed, there was a deformity of her first toe, there was hammering of her second, third, fourth, and fifth toes, and she had pain in the bottom of the second and third toes because of the way she was walking on the outside of her foot. On December 27, 2018, Dr. Patel surgically fixed these issues. Later, after trying conservative treatment again, he determined that plaintiff needed surgical procedures on her right foot as well. Dr. Patel described plaintiff's problems in her right foot as a failed fusion of the first toe, hammering of the second, third, and fourth toes, and pain on the bottom of her second, third, and fourth toes because of walking on her foot abnormally. On June 24, 2019, Dr. Patel surgically fixed these issues. On

October 7, 2019, Dr. Patel removed hardware from plaintiff's right foot. On December 16, 2021, Dr. Patel operated on plaintiff's right foot again to fuse the first toe, to release ligaments in other toes, to repair tendons, and to remove some hardware from the first toe. On February 20, 2023, Dr. Patel again removed hardware from plaintiff's right foot. Dr. Patel testified that plaintiff would have this deformity for the rest of her life, she will have pain in her feet for the foreseeable future, and the fusion of her toes means that she cannot engage in any high-impact activity like running, jumping, and hiking. She is also more likely to have joint arthritis, she is unable to wear heeled shoes, and she will need new orthotics every year or two for the rest of her life.

¶ 27    Dr. Patel further testified that plaintiff presented with a destabilized foot, which he explained is "not really an orthopedic terminology" but means it is not a normal foot anymore. Specifically, "on the right side especially, the bunion [reocurred], it became arthritic," she had "transfer metatarsalgia," she began "walking differently," and her other toes "started clawing," requiring additional surgeries. He testified that "the surgeries that she had in the past was one of the reasons why [she was] in this situation." On cross-examination, Dr. Patel confirmed that he had not reviewed plaintiff's medical records from Foot First Podiatry. He also confirmed that surgical revisions are sometimes necessary following the initial bunionectomy or tenotomy.

¶ 28    During the trial, there was a discussion regarding Arturo Estrada's billing testimony and defendants' counsel objected to the late disclosure of the witness and also claimed that the foundation for Estrada's testimony was inadequate. After reviewing the *voir dire* of Estrada, the court ruled that, "[o]ver the defense objection, [the court] will let him testify to the full bills."

¶ 29    Estrada, an operations coordinator for Northwestern's billing department, testified via video deposition. The following summary includes the testimony from the *voir dire* examination. He testified that his job duties include overseeing the on-site staff and the outside vendors for the

customer service team who assist with patients' medical bills. He confirmed that he is familiar with the usual, customary, and reasonable charges for hospital facilities and professional charges in the Chicagoland area. He explained that his familiarity is a result of years of experience working with a company prior to Northwestern, which involved billing customer service for different organizations around the United States, and his seven years of experience at Northwestern where he has assisted patients with resolving billing disputes by investigating and auditing charges to ensure they are "in line with other outside organizations" in the Chicagoland area. He also testified that "all of [their] services are audited yearly by an outside company, who [he believes] is still Ernst & Young, where they make sure that our charges are in comparison to other teaching institutes and in line with [the Centers for Medicare & Medicaid Services] guidelines." As to plaintiff's bills, he testified that the charges from Northwestern were for services occurring between October 30, 2018, and December 16, 2021. When asked if he had reviewed plaintiff's medical bills in preparation for the deposition, Estrada answered that he "had the bills audited" to determine whether any corrections needed to be made "but everything came back as good for the patient." He further testified that the audit confirmed that plaintiff actually received the services for which she was billed and that they were coded properly and that the charges issued by Northwestern to plaintiff "would be" the usual and customary charges in the Chicagoland area. Finally, he testified that plaintiff's charges totaled $290,495. Over defendants' objection, plaintiff entered into evidence the medical bills.

¶ 30    Plaintiff rested her case, and defendants moved for a directed verdict, which the trial court denied.

¶ 31    Dr. S. Sklar testified that she is a doctor of podiatric medicine, and she has worked with her father at Foot First Podiatry since 2015. She testified that she and her father are both typically

involved in the care of their patients, and they usually perform surgeries together. She testified that it is not unusual for either her or her father to handle presurgery visits as well as postsurgery follow-up appointments. She further testified that she was present and participated in plaintiff's surgeries (except the screw removal surgeries).

¶ 32 Dr. S. Sklar testified that, at plaintiff's first visit, plaintiff was concerned with her bunions and her ability to wear shoes without developing blisters, and according to Dr. S. Sklar, she "always discuss[es] conservative treatments" with patients. Based on her notes, she "did go into surgical detail on that visit because [plaintiff] did seem very interested in having surgery." In particular, she discussed the specific procedures that were ultimately performed, including the two osteotomies and the shaving of the bone and tissue. She testified that, at Foot First Podiatry, they usually reserve the option of just shaving the bone and tissue for elderly patients who have low activity levels because of the likelihood of the bunion returning with that surgery. For that reason, she did not recommend that procedure to plaintiff. Dr. S. Sklar believed the two osteotomies were the "appropriate procedure[s]," despite not having X-rays of plaintiff's feet at the time, because the recurrence of a bunion was lesser with that procedure. She testified that they "wanted to give her a long-lasting result of no abrasions" and "[t]hat was the goal of surgery."

¶ 33 Dr. S. Sklar agreed that the procedures on plaintiff's left foot were successful and there was no need for any additional surgeries. Regarding the tenotomies, that procedure was performed to address "some hammering of the digits" and "it was appropriate for what [she] saw at the time." However, the ultimate decision regarding which, if any, surgeries would be performed was left to her father. Dr. S. Sklar testified that Dr. Patel's later surgical fusion of plaintiff's toes was not done because their surgeries failed, but because plaintiff's "feet continued to worsen, and that is what needed to be done at the time." She further testified that Dr. Patel's fusion surgery "wasn't

necessary" at the time plaintiff presented at Foot First Podiatry. According to Dr. Sklar, plaintiff's last visit to Foot First Podiatry was about three months after her second surgery and plaintiff's complaints of pain and swelling was "not abnormal" in her opinion. On cross-examination, Dr. Sklar confirmed that plaintiff had reported to her at the first appointment that she had not tried any form of treatment for her condition other than changing shoes. She also confirmed that, during the first visit, she did not take any measurements or X-rays of plaintiff's feet.

¶ 34    Dr. Rodney Stuck, a doctor of podiatric medicine, testified as defendants' expert witness. In advance of trial, he reviewed plaintiff's medical records from all the relevant treatment providers and the depositions of plaintiff, her treatment providers, and Dr. Dobbs. Dr. Stuck testified that he did not agree with Dr. Dobbs's opinion that the surgeries at Foot First Podiatry were not indicated and were a deviation from the standard of care because, according to him, the decision is not based only on the IM angle. Rather, "[t]here are multiple variables that are factored into a clinical decision to do a bunionectomy and the type that you do." He further testified that both of osteotomies Dr. K. Sklar performed on plaintiff "are recognized methods to be used for [bunion] correction." He also disagreed with Dr. Dobbs's opinion that the tendon lengthening procedures was a deviation from the standard of care because "a lengthening is what you would expect to do to reduce some of that deformity." He also disagreed with Dr. Dobbs's testimony that those lengthening procedures resulted in the need for Dr. Patel's fusion procedures.

¶ 35    Instead, Dr. Stuck testified that Dr. Patel's procedures were required due to "[p]rogression of [plaintiff's] deformities" and could have been related to her diabetes and that other less invasive procedures for correcting a bunion were not appropriate for plaintiff because of the likelihood that the bunion would reoccur. According to Dr. Stuck, the procedures Dr. K. Sklar performed were appropriate because plaintiff's "first metatarsal head *** needed to be reduced in size and moved

over to reduce the risk of ulceration in the future" and then the second osteotomy was necessary "to bring the [first] toe away from that second toe so that you'll have a longer lasting correction." Based on the pre- and postoperative photos of plaintiff's feet, Dr. Stuck testified that Dr. K. Sklar's surgeries were successful. Dr. Stuck also testified that there is a 15 to 20 percent chance of bunion reoccurrence following a bunionectomy and the reoccurrence of plaintiff's bunion was not a consequence of Dr. K. Sklar's choice of surgical procedures. Dr. Stuck was not familiar with the term "destabilized" but he nonetheless testified that Dr. K. Sklar's surgeries did not destabilize plaintiff's feet leading to future surgeries. Finally, Dr. Stuck testified that Dr. K. Sklar performed the correct surgical procedures, and he pointed to plaintiff's left foot as evidence of that because that foot has "held up."

¶ 36   On cross-examination, Dr. Stuck disagreed with Dr. Dobbs's testimony that it would be a deviation from the standard of care to perform osteotomies with IM angles of 5 and 8, and he disagreed with Dr. Dobbs's statement that plaintiff had normal feet when she first visited Foot First Podiatry. He agreed that the standard of care would require attempting conservative treatment prior to surgery and that Drs. Sklar did not recommend conservative treatment for plaintiff. He further testified that he did not teach the Sklar bunionectomy and he had not seen it referred to in any published literature. Finally, and as relevant here, the following exchange occurred:

> "[MR. BOLLINGER (PLAINTIFF'S COUNSEL)]: Okay. Doctor, in reviewing Dr. Patel's deposition—did you review that?
>
> [DR. STUCK]: I did.
>
> [MR. BOLLINGER]: Did you see when he—in his deposition that he said he would not have done this osteotomy on that foot?

MR. REDDEN [(DEFENDANTS' COUNSEL)]: Your Honor, I object and I need to be heard on this, please.

\* \* \*

MR. REDDEN: So we brought a motion *in limine* to bar cross-examination of our expert on deposition testimony of Dr. Patel, which is inherently inadmissible, because it was—certain portions of it were opinions that dealt with the standard of care, and [Dr.] Patel cannot give standard of care testimony against a podiatrist.

Counsel said to me in open court in agreeing with that motion that, [']Of course I can't do that. I can't backdoor inadmissible testimony just because your doctor relied upon it.['] And that is just what he did. Cited to a comment by Dr. Patel: He wouldn't have done the surgery. That is a standard of care opinion, and it was purposeful. That was a violation of the motion *in limine*. I think it should be stricken, and Counsel should be directed not to go any further with any commentary out of Dr. Patel's discovery deposition.

MR. BOLLINGER: What he did and what he said had nothing to do with standard of care. He did not express anything relating to the standard of care. In reviewing this—

THE COURT: But don't you think he is when he says that he would not have done the bunionectomy? I mean, that's your whole case. Your whole case is they should have done conservative care, and they shouldn't have done the bunionectomy.

So when the jury hears that an orthopedic surgeon says—which I didn't hear him say it when he testified—that he would not have done the bunionectomy, that's what he's testifying to.

MR. REDDEN: And it wasn't in his evidence deposition. It was in his discovery deposition. That's what he cited, so that's why you didn't hear it.

MR. BOLLINGER: But that's because—that's because he said to [defendants' counsel] that he relied on all the materials that he was given. If he relied on all those materials, I certainly have a right after he has said, [']This is a normal foot[.'] *** I should be able to show that there is a disagreement between him and the orthopedic surgeon.

THE COURT: No, because it's not relevant for any purpose. Who cares if [Dr.] Patel thinks there's a disagreement? He's an orthopedic surgeon.

If you wanted to put in evidence about an orthopedic surgeon, I guess you could have dealt with that in a motion *in limine* or during discovery. But it was—it was agreed upon, and there was going to be no testimony.

Because I brought it up, remember? I talked about it. And you said, well, the difference is it's an MD, when I said that sometimes more—doctors who are more specialized give opinions regarding less specialized physicians. *** And you clearly stated that you wouldn't. But you did, and now you've intimated to the jury that Dr. Patel disagrees with what the podiatrist did and I don't even know if that's true.

* * *

THE COURT: I'm trying to fix what I should say for the purposes of striking it before the jury. That's all I'm saying.

MR. ARMBRUSTER [(PLAINTIFF'S COUNSEL)]: He didn't give an answer to the question.

MR. REDDEN: Well, the statement was made, so the question has to be stricken. There's nothing else I can ask for in a remedy at this point.

THE COURT: Okay. That's what we'll do.

- 18 -

MR. REDDEN: But I would like the Court to offer some direction in terms of any further conduct like this, because that was—I could not have been more explicit in our motion. And my understanding from what counsel said, ['Mr. Redden], it's not going to happen,['] just happened. And I don't want to keep jumping up and objecting and calling attention to this kind of behavior.

So I think that the Court should direct that Counsel cannot make reference to Dr. Patel's deposition any further.

THE COURT: Okay. And you can't make any reference to Dr. Patel's opinion about the bunionectomy, because that's not relevant at this point, okay? All right."

¶ 37    The trial court then admonished the jury, stating: "Counsel for the plaintiff asked a question to this witness about Dr. Patel's opinion regarding the bunionectomy. The jury is to disregard any testimony or evidence indicating what Dr. Patel's opinion is regarding it."

¶ 38    Dr. K. Sklar, a doctor of podiatric medicine, testified that he founded Foot First Podiatry in 1985, he has been practicing as a podiatrist there since then, and he developed the Sklar bunionectomy as a modification of the "Austin" and "Akin" bunionectomies, but he has never published this procedure. He testified that, after the initial visit where plaintiff was given the options of conservative treatment or surgery, plaintiff contacted Foot First Podiatry and requested a surgical consultation with him. He explained that, generally, during that appointment, he would conduct a thorough examination of the patient's foot, take X-rays of the foot, and discuss the surgery, including the complications and proper pre- and postoperative care. During his consultation with plaintiff, he was under the impression that she was interested in surgical correction of her bunions and, because of her diabetes, plaintiff's circulation and blood sugar levels were checked at this appointment. In his opinion, "simply burring down the bone and realigning

some soft tissue" was not a reasonable treatment for plaintiff's condition because she needed a longer-lasting outcome, and he disagreed with Dr. Dobbs's opinion that the procedures performed on plaintiff were unnecessary and excessive for her condition. He recommended the Sklar bunionectomy to plaintiff "[b]ecause she had a structural deformity, and [she] needed an osteotomy to correct the structure." Regarding the IM angle, Dr. Sklar testified that plaintiff's IM angles were "in the range of normal" but they were not "normal for her," her feet "still hurt," she "still had a bump, and her toe was going [in] the other direction, so it needed to be corrected."

¶ 39    Dr. K. Sklar then explained the surgeries he performed on plaintiff, stating that he "broke the bone and moved it closer to the second metatarsal," which would take "the pressure off her skin [so] it doesn't irritate anymore" and then he moved the first toe away from the second toe "so she doesn't get squishing of the rest of her toes." He also performed the z-plasty tenotomies on plaintiff's other toes to flatten them out and "to rebalance her toes" and, contrary to prior testimony, he did not cut the tendons but only stretched the tendons "so they still functioned but in a less[er] manner." He stated that this "would slow the cause of a hammertoe." In his opinion, he "corrected what [plaintiff] came in for." After the surgeries, when plaintiff raised some concerns with the hammering of her first toe, he directed her to the Weil Institute. He further testified that his stretching of plaintiff's tendons did not lead to the hammering on those toes that Dr. Patel fixed. He also testified that he was not familiar with Dr. Dobbs's term "destabilized." Finally, he agreed that the surgeries he performed on plaintiff left her with a "well-corrected foot to avoid and alleviate the potential of these sores" and that the bunion and hammertoe corrections "maintained."

¶ 40    On cross-examination, he testified that he did not go through all of the different surgical procedures for bunion correction with plaintiff, and it was not necessary to do so because the Sklar bunionectomy was the proper procedure for correcting plaintiff's bunions.

¶ 41    During closing arguments, plaintiff's counsel made the following statements:

"If you decide defendant was negligent and his negligence was a proximate cause of the injury to the plaintiff, it is not a defense that something or someone else may be a cause of that injury. So unless you disbelieve everything Dr. Patel has said, the treating doctor who has no dog in this fight, that tells you if you believe that surgery should not have been done, *** Dr. Sklar is on the hook."

¶ 42    Later, defendants' counsel made the following statement during closing argument: "Mindful, I hope you all are, that the condition of [plaintiff's] feet now is a consequence of multiple surgeries that Dr. Patel thought necessary and unrelated to the care provided by Dr. Sklar." He also stated that Dr. Patel "testified to you [that] he told [plaintiff], bunions always get worse and they will progress to a worst stage at some point, and you'll need some sort of corrective surgery."

¶ 43    At the end of closing arguments, the court provided several admonishments to the jury, including the following:

"The opening statement[s] given at the start of the trial are what attorneys expect the evidence to be. The closing arguments given at the conclusion of the case are a summary of what the attorneys contend the evidence has shown. If any statement or argument of an attorney is not supported by the law or the evidence, you should disregard that statement or argument."

¶ 44    After the jury was excused for deliberation, a discussion was had between counsel and the court. Defendants' counsel referenced statements made by plaintiff's counsel that appeared to be directed at specific jurors and defendants' counsel sought to object to those statements. The following exchange occurred:

"MR. REDDEN: I didn't make an objection because there's nothing you can do to cure that, but I want to put it on the record that I do have an objection to that and deal with it down the road. But I just—I believe that was inappropriate.

THE COURT: And I could have cured it if you had made the objection at the time. But you know, I'm more concerned with the fact that, you know, you kept talking about Dr. Patel like he was giving an opinion or he was critical of Dr. Sklar, and he wasn't. You're going to have some problems on that record. You're going to have some problems on that record, okay? It shouldn't have been done."

¶ 45 The jury ultimately returned a verdict in favor of plaintiff for $2,865,495, and on March 29, 2023, the trial court entered judgment in accordance with the jury's verdict.

¶ 46 On June 5, 2023 defendants filed a motion for a new trial, asserting, *inter alia*, that plaintiff improperly referenced Dr. Patel's standard of care opinion and Estrada did not meet the criteria to testify as a billing witness and should have otherwise been barred from testifying as a violation of Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018). On July 20, 2023, plaintiff filed a response to defendants' posttrial motion, which included an affidavit from the jury foreperson. On August 2, 2023, defendants filed their reply, asserting, *inter alia*, that the foreperson's affidavit was without evidentiary value, the waiver rule did not bar their request for a new trial, and plaintiff's characterization of the use of Dr. Patel's testimony was unavailing. Following a hearing, on September 11, 2023, the trial court denied defendants' posttrial motion. A transcript from that hearing, or an acceptable substitute, was not included in the record. See Ill. S. Ct. R. 323 (eff. July 1, 2017).

¶ 47    On October 10, 2023, defendants filed an emergency motion to stay enforcement of the judgment and an extension of time to file an appeal bond, which the trial court granted on October 11, 2023.

¶ 48    On November 17, 2023, defendants filed a motion for approval of an appeal bond in the amount of $1,850,000, reflecting the amount of insurance coverage available to them under their liability policy. Plaintiff objected to the amount of the bond.

¶ 49    On November 27, 2023, the trial court held a hearing on defendants' motion. This hearing was memorialized in a bystander's report and approved by the court in accordance with Illinois Supreme Court Rule 323 (eff. July 1, 2017). At the hearing, the court inquired as to why plaintiff objected to the proposed bond. Plaintiff's counsel argued that the proposed bond was not in compliance with Illinois Supreme Court Rule 305(a) (eff. July 1, 2017), as it was not for the amount of the judgment plus interest. Defendants' counsel responded that $1.85 million was the amount of insurance available. The trial court granted defendants' motion on that same date.

¶ 50    On January 30, 2024, plaintiff filed a motion to reconsider, and, on January 31, 2024, the trial court denied that motion.

¶ 51    Defendants filed a timely notice of appeal following the denial of their posttrial motion (case No. 1-23-1830), and plaintiff filed a timely notice of appeal following the denial of her motion to reconsider the court's approval of the appeal bond (case No. 1-24-0436).

¶ 52                                  II. ANALYSIS

¶ 53    On appeal, defendants argue that the trial court abused its discretion in denying their motion for a new trial and in allowing plaintiff's billing witness to testify. In a separate appeal, plaintiff argues that the amount of defendants' appeal bond is insufficient. On this court's own motion, and in the interest of convenience to the parties, the appeals have been consolidated.

¶ 54                                          A. Motion for a New Trial

¶ 55    Defendants' first argue that the trial court abused its discretion in denying their motion for

a new trial where plaintiff improperly referenced on three separate occasions Dr. Patel's previously

barred standard of care opinions, resulting in substantial prejudice to defendants. According to

defendants, this was reversible error and they request that we remand for a new trial.

¶ 56                                          1. *Forfeiture*

¶ 57    However, we must first address plaintiff's contention that defendants failed to object to the

challenged references made during opening and closing arguments and thus those challenges are

forfeited. In their reply, defendants concede that they failed to contemporaneously object during

opening statements and closing arguments and request that this court relax the forfeiture rule under

these circumstances. We decline.

¶ 58    "A court's evidentiary rulings are unreviewable on appeal if they have not been properly

preserved." *Guski v. Raja*, 409 Ill. App. 3d 686, 695 (2011). "Failure to raise claims of error before

the trial court denies the court the opportunity to correct the error immediately and grant a new

trial if one is warranted, wasting time and judicial resources." *People v. McLaurin*, 235 Ill. 2d 478,

488 (citing *People v. Enoch*, 122 Ill. 2d 176, 185-87 (1988)). To preserve an issue for appellate

review, a party must both contemporaneously object and file a timely written posttrial motion

addressing it. *Enoch*, 122 Ill. 2d at 186; *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill.

App. 3d 806, 826 (2008). Failure to do either results in forfeiture of that issue on appeal. *Enoch*,

122 Ill. 2d at 186.

¶ 59    Here, defendants failed to contemporaneously object during plaintiff's opening statement

closing argument where plaintiff, according to defendants, improperly referenced or alluded to Dr.

Patel's barred standard of care opinion. In particular, during opening statement, counsel stated that

Dr. Patel's testimony will be "that [plaintiff] did not need an osteotomy, because he's going to tell you that he looked at her x-rays, her presurgery x-rays from her first visit when she went to Foot First Podiatry Center" and "that she had a normal foot by x-ray when she presented at Foot First Podiatry Center." And, during closing argument, counsel stated: "So unless you disbelieve everything Dr. Patel has said, the treating doctor who has no dog in this fight, that tells you if you believe that surgery should not have been done, *** Dr. Sklar is on the hook." Defendants did not object to either of these statements, and there is no indication that the trial court would have ignored defendants' objection, particularly where the record shows that the court specifically noted that improper comments were made. Without an objection, defendants failed to avail themselves of the trial court's ability to remedy any potential prejudice from these two comments. "A party cannot sit on his hands and let perceived errors into the record and complain of those errors for the first time in a post-trial motion." *Pharr v. Chicago Transit Authority*, 220 Ill. App. 3d 509, 515 (1991). Thus, the alleged errors in opening statement and closing argument were not properly preserved, and the forfeiture doctrine is applicable. See *Allen v. Sarah Bush Lincoln Center*, 2021 IL App (4th) 200360, ¶¶ 200-05 (citing multiple medical malpractice cases where the reviewing court declined to consider unpreserved errors relating to improper closing arguments).

¶ 60     However, we acknowledge that the rule of forfeiture is a limitation on the parties and not on the jurisdiction of the reviewing courts. *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 789 (1992). Under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), a reviewing court "may, in its discretion, and on such terms as it deems just *** enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief *** that the case may require." Our supreme court has held this rule to be analogous to the plain error doctrine utilized in criminal jurisprudence. *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967).

Thus, pursuant to Rule 366(a)(5), "courts of review may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent." *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33; see *Klaine v. Southern Illinois Hospital Services*, 2016 IL 118217, ¶ 41 ("we may overlook any forfeiture in the interest of maintaining a sound and uniform body of precedent"). Nonetheless, as the court has admonished, the rule does not "nullify standard waiver and forfeiture principles" and it should "not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will." *Jackson*, 2012 IL 111928, ¶ 33. Accordingly, "despite the absence of objection, a reviewing court may consider claims of improper statements *** to the extent such statements prevented a fair trial." *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 585 (1993); *Ryan v. Katz*, 234 Ill. App. 3d 536, 542 (1992) ("[a]lthough we may disregard the waiver rule in the interests of justice [citation], we will not do so unless [the] improprieties deprived the [complaining party] of a fair trial"). Under these circumstances, we do not find that the brief improper statements made during opening statement and closing argument resulted in an unfair trial for defendants for the following two reasons.

¶ 61     First, defendants themselves referenced Dr. Patel's testimony in their own opening statement and closing argument. Specifically, during opening statement, defendants' counsel stated: "And Counsel said to you inaccurately that Dr. Patel is going to say, [']This is all the fault of Dr. Sklar.['] He says no such thing." And, during closing argument, defendants' counsel stated: "Mindful, I hope you all are, that the condition of [plaintiff's] feet now is a consequence of multiple surgeries that Dr. Patel thought necessary and unrelated to the care provided by Dr. Sklar." In fact, the trial court specifically stated that both parties had referenced Dr. Patel's standard of care testimony and that they might have some "problems" with that record. Thus, rather than making a

timely objection and allowing the court the opportunity to cure any potential resulting prejudice, defendants' counsel instead highlighted that comment by attempting to negate it in both opening statement and closing argument. "A party who 'procures, invites or acquiesces' in the admission of improper evidence cannot complain that such evidence was prejudicial to his case." *Smith by Smith v. Victory Memorial Hospital*, 167 Ill. App. 3d 618, 623 (1988) (quoting *People v. Burage*, 23 Ill. 2d 280, 283 (1961)). As such, notwithstanding the impropriety of the comments, we cannot say that defendants' trial was unfair where they affirmatively contributed to any potential prejudice themselves.

¶ 62    Second, although the trial court was not given the opportunity to sustain an objection and provide a curative instruction, any prejudicial effect from the comments in opening statement and closing argument was nonetheless minimized by the trial court's instruction to the jury on two occasions that opening statements and closing arguments are not evidence. "The jury is presumed to follow the instructions given by the circuit court," and such an instruction "is generally recognized as curing any improper comments made in opening statements." *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 90. Thus, even had these alleged errors been properly preserved, we would nonetheless reject defendants' claim of *substantial* prejudice. See *People v. Sutton*, 353 Ill. App. 3d 487, 505 (2004) (the limited nature of the improper comments and the curative instruction precluded a finding of substantial prejudice).

¶ 63                    2. *Cross-Examination of Dr. Stuck*

¶ 64    We next consider defendants' claim that the trial court should have granted their motion for a new trial on the basis of plaintiff's violation of the *in limine* order during cross-examination of Dr. Stuck as there *was* a proper contemporaneous objection in that instance.

¶ 65    "On a motion for a new trial, the trial court will set aside the jury verdict and order a new trial only if (1) the jury verdict is contrary to the manifest weight of the evidence or (2) serious and prejudicial errors were made at trial in the exclusion or admission of evidence." *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 56. Defendants' argument here implicates the latter. We review the trial court's decision on a motion for a new trial for abuse of discretion. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 38. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41. We note that the record does not contain a transcript from the hearing on the motion for a new trial, or an acceptable substitute, in violation of Illinois Supreme Court Rule 323 (eff. July 1, 2017). Although we do not have the transcript or any reasoning provided by the trial court in denying the motion, we nonetheless have the entirety of the trial transcript and are able to determine on the record before us whether the court abused its discretion in finding that the improper question on cross-examination was not a serious and prejudicial trial error requiring a new trial.

¶ 66    According to defendants, plaintiff "impermissibly introduced Dr. Patel's previously barred standard of care opinions into the trial" during cross-examination of defendants' expert witness. Doing so "was contrary to the agreement reached between all counsel and the trial judge during the motions *in limine*" and to "our supreme court's longstanding requirement that only a podiatrist can criticize the care of another podiatrist."

¶ 67    To prevail in a medical negligence claim, the plaintiff must demonstrate: "(1) the standard of care against which the medical professional's conduct is to be measured; (2) a negligent failure by the medical professional to comply with the standard of care; and (3) that the medical professional's negligent conduct proximately caused the injuries that the plaintiff seeks to redress."

*Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 60. The plaintiff establishes the standard of care through the use of expert witnesses. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 32. For medical experts, there are two foundational requirements: (1) "the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify" and (2) "the expert must be familiar with the methods, procedures and treatments ordinarily observed by other health-care providers in either the defendant's community or a similar community." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 114-15 (2004).

¶ 68    *Dolan v. Galluzzo*, 77 Ill. 2d 279 (1979), is the preeminent case on this issue and is particularly relevant here as the plaintiff's case in *Dolan* also involved podiatric medicine. There, our supreme court held that an orthopedic surgeon could not be permitted to testify as to the standard of care applicable to a podiatrist. *Id.* at 285. In so holding, the court stated the following:

> "We simply are not disposed to provide for what, in effect, may result in a higher standard
>
> of care when the legislature, by recognizing various schools of medicine, has not done so.
>
> To do so would not only be unfair to podiatrists (*i.e.*, to allow practitioners of other schools
>
> to testify regarding the standard of care podiatrists owe), but it would also assume that
>
> science and medicine have achieved a universal standard of treatment of disease or injury.
>
> Such is not the case." *Id.* at 284.

Thus, the court concluded that "in order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein." *Id.* at 285. Since *Dolan*, the supreme court has reaffirmed this rule on multiple occasions. See, *e.g.*, *Sullivan*, 209 Ill. 2d 100; *Gill v. Foster*, 157 Ill. 2d 304 (1993); *Jones v. O'Young*, 154 Ill. 2d 39 (1992).

¶ 69    In this case, defendants filed motions *in limine* to bar plaintiff from referencing or using any testimony of Dr. Patel that would bear on the standard of care because he is an orthopedic

surgeon, not a podiatrist. Plaintiff had no issue with this motion and readily agreed during the pretrial hearing on defendants' motions *in limine*.

¶ 70    Despite plaintiff's agreement, defendants contend that plaintiff's counsel improperly referenced Dr. Patel's barred standard of care testimony. Before turning to the merits, we make clear that, in accordance with *Dolan*, Dr. Patel was not permitted to testify as to the standard of care because he was an orthopedic surgeon and not a podiatrist. *Dolan* and its progeny have expressly ruled that "a health-care expert witness must be a licensed member of the school of medicine about which the expert testifies" (*Sullivan*, 209 Ill. 2d at 119), and we will not deviate from that precedent here. See *Schiffner v. Motorola, Inc.*, 297 Ill. App. 3d 1099, 1102 (1998) ("the doctrine of *stare decisis* requires courts to follow the decisions of higher courts").

¶ 71    During cross-examination of defendants' expert, the following exchange took place:

> "[MR. BOLLINGER (PLAINTIFF'S COUNSEL)]: Okay. Doctor, in reviewing Dr. Patel's deposition—did you review that?
>
> [DR. STUCK]: I did.
>
> [MR. BOLLINGER]: Did you see when he—in his deposition that he said he would not have done this osteotomy on that foot?
>
> MR. REDDEN [(DEFENDANTS' COUNSEL)]: Your Honor, I object and I need to be heard on this, please.

¶ 72    Subsequently, the court and the parties' respective counsel discussed the improper question, which violated the parties' *in limine* agreement by expressly referencing Dr. Patel's barred standard of care testimony. Plaintiff contended, at the time, that they were permitted to reference it because Dr. Stuck testified that he had reviewed Dr. Patel's *discovery* deposition, as opposed to the evidence deposition. Notably, at no point during Dr. Stuck's testimony was it

specified that he had reviewed the discovery deposition, as opposed to the evidence deposition, and as such, plaintiff's contention was belied by the record itself. Regardless, the court agreed that such testimony was "not relevant for any purpose" and the question was improper. Defendants' counsel then requested that the court direct plaintiff's counsel from making any further reference to Dr. Patel's barred testimony, which the court did, and the court instructed the jury "to disregard any testimony or evidence indicating what Dr. Patel's opinion is regarding [the bunionectomy]."

¶ 73    A motion *in limine* permits a party to obtain an order prior to trial "excluding inadmissible evidence and prohibiting interrogation concerning such evidence without the necessity of having the questions asked and objections thereto made in the presence of the jury." *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 851 (2010). Violation of an *in limine* order, however, is not *per se* reversible error "unless the party has been substantially prejudiced." *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 395 (2000); see *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 862 (2008) (recognizing the general rule that an improper comment that violates a motion *in limine* will only constitute reversible error where the other party has been substantially prejudiced). "The party seeking reversal bears the burden of showing such prejudice." *McHale*, 2015 IL App (1st) 132625, ¶ 74.

¶ 74    We first reject plaintiff's reliance on the affidavit from the foreperson. Defendants contend that the jury foreperson's affidavit is inadmissible and that this court should not consider it, citing *Spaetzel v. Dillon*, 393 Ill. App. 3d 806 (2009), and we agree. In *Spaetzel*, the trial court struck two juror affidavits that the plaintiffs submitted in support of their posttrial motion. *Id.* at 810. In the affidavits, the jurors averred that a doctor's testimony at trial regarding CT scans was extremely influential and their decision would have been different had the doctor not given such testimony. *Id.* On appeal, the plaintiffs argued that the affidavits were being used to show prejudice, which is

permissible, and this court disagreed. *Id.* The court found that the affidavits went to the jurors' "deliberations and mental processes," which is "precisely the type of affidavit that is inadmissible." *Id.* at 811-12. We come to the same conclusion here. Juror affidavits are inadmissible where they are offered in an attempt to prove "the motive, method or process by which the jury reached its verdict" (*People v. Holmes*, 69 Ill. 2d 507, 511 (1978)), and thus, the jury foreperson's affidavit submitted in this case, which sought to prove that the jury was not motivated by the improper statements, is inadmissible.

¶ 75    Nonetheless, we ultimately agree with plaintiff that the improper question did not rise to the level of substantial prejudice or of denying defendants a fair trial.

¶ 76    The record shows that as soon as plaintiff's counsel asked the improper question during Dr. Stuck's cross-examination, defendants' counsel objected, and following a sidebar, the court admonished the jury to disregard any testimony regarding Dr. Patel's opinion on the bunionectomy. An "instruction to disregard certain evidence can cure prejudice resulting from the jury's exposure to that evidence" (*Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 891 (1992)), and "[t]he jury is presumed to have followed the court's instruction" to disregard that question (*McDonnell v. McPartlin*, 192 Ill. 2d 505, 535 (2000)). See *Willaby*, 383 Ill. App. 3d at 862 ("Where the trial court sustains a timely objection and instructs the jury to disregard the improper comment, the court sufficiently cures any prejudice."). Significantly, the court not only directed the jury to disregard the question, but to disregard any statement regarding Dr. Patel's opinion on the bunionectomy, and thus, in our view, the court's admonishment may have also served to cure any potential prejudice resulting from other improper comments made about Dr. Patel's opinion. Presuming that the jury followed the court's instruction, as we must, any prejudice was cured.

¶ 77    Additionally, although plaintiff's counsel's question explicitly stated that Dr. Patel testified that he would not have done the osteotomy, the question was nonetheless unanswered, it was a single improper reference to Dr. Patel's barred testimony, and plaintiff's counsel did not continue that line of questioning following the sidebar. Further, "[e]rroneously admitted evidence that is cumulative and does not otherwise prejudice the objecting party is harmless." *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶ 160. Here, Dr. Dobbs, plaintiff's expert witness in the field of podiatric medicine, testified that the surgeries were a deviation from the podiatric standard of care. Thus, plaintiff's counsel's unanswered question suggesting that Dr. Patel would not have done the osteotomy was duplicative of Dr. Dobbs's properly admitted testimony. See *Gulino*, 2015 IL App (1st) 131587, ¶ 80 (even were the doctor's testimony improper standard of care evidence, "the testimony was necessarily harmless given it was duplicative of that offered by [the registered nurse]"); *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 107 (recognizing that improperly admitted testimony is harmless where it is duplicative of other properly admitted testimony). In light of Dr. Dobbs's testimony and the court's curative instruction, we deem the error to have been harmless.

¶ 78    In sum, plaintiff's single improper question during cross-examination, which the court instructed the jury to disregard, did not result in substantial prejudice to defendants, and even had defendants properly preserved their claims of error as to plaintiff's opening statement and closing argument, the cumulative effect would not have resulted in an unfair trial. "[A] party is not entitled to a perfect trial, only to a fair trial free of substantial prejudice." *Garest v. Booth*, 2014 IL App (1st) 121845, ¶ 48. Our review of the record demonstrates that the trial was conducted fairly, the trial court properly admonished the jury where appropriate, and the jury's verdict in favor of plaintiff was supported by ample evidence. Accordingly, the trial court's denial of defendants'

motion for a new trial was neither arbitrary nor unreasonable, and thus, did not constitute an abuse of discretion.

¶ 79                    B. Testimony From Plaintiff's Billing Witness

¶ 80    Second, defendants argue that the trial court abused its discretion in allowing plaintiff "to introduce the testimony of a billing employee who lacked the most basic knowledge regarding the subject about which he testified." In particular, defendants contend that Estrada was unable "to supply the foundation needed for portions of the medical expenses that were adjusted and never paid" and that the belated disclosure of Estrada as a witness should have precluded him from testifying pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018). As such, defendants request a remittitur.

¶ 81    Before proceeding, we first address plaintiff's argument that this issue is forfeited where defendants failed to contemporaneously object when the medical bills were entered into evidence. As stated previously, preservation of a claim of error requires a contemporaneous objection and inclusion of that claim in a posttrial motion. *Enoch*, 122 Ill. 2d at 186. Our review of the record reveals that defendants' counsel objected on the basis of foundation during the direct examination of Estrada and objected to the admission of the medical bills following Estrada's testimony. As such, we decline plaintiff's request that we find this claim of error forfeited, and we now consider whether the trial court erred in allowing Estrada's testimony.

¶ 82    The admission of evidence is within the trial court's discretion, and the court's ruling will not be reversed absent an abuse of discretion. *Gill*, 157 Ill. 2d at 312-13. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour*, 2015 IL 118432, ¶ 41.

For the reasons that follow, we conclude that the trial court did not err in allowing Estrada's testimony to be introduced into evidence.

¶ 83    Before addressing defendant's claim concerning the insufficiency of a foundation to admit Estrada's testimony, we must first address defendant's claimed Rule 213 violation.

¶ 84    We disagree with defendants' assertion that the trial court should have barred plaintiff's belated disclosure of Estrada pursuant to Rule 213 and the factors set forth in *Sullivan*, 209 Ill. 2d 100. Illinois Supreme Court rules on discovery are mandatory rules requiring strict compliance by the parties. *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 377 (2003). Rule 213(f)(3) requires that, upon written interrogatory, "a party must furnish the identities and addresses of witnesses who will testify at trial." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). "Rule 213 is designed to give those involved in the trial process a degree of certainty and predictability that furthers the administration of justice and eliminates trial by 'ambush.' " *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 946 (2000). Further, "[t]o allow either side to ignore the plain language of Rule 213 defeats its purpose and encourages tactical gamesmanship." *Clayton*, 346 Ill. App. 3d at 378.

¶ 85    However, "the failure to comply with Rule 213 does not automatically require the exclusion of the noncomplying party's witnesses or testimony." *Zichur v. Ericsson, Inc.*, 2011 IL App (1st) 103430, ¶ 80. Rather, the court must consider these factors: "(1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness." *Id.* (citing *Sullivan*, 209 Ill. 2d at 110).

¶ 86    In the case before us, most of these factors weigh in favor of plaintiff and we conclude that exclusion of Estrada's testimony was not required. First, defendants cannot claim surprise where

this precise issue was discussed at a pretrial hearing on their own motion *in limine*, where they took issue with plaintiff's failure to name the billing witness. At the end of the discussion, defendants' counsel stated: "We don't need to decide this now. I will ask at the time to be allowed to *voir dire* this witness outside the presence of the jury, since we didn't have any disclosure of her or her qualifications in advance." In our view, defendants were informed that the witness was going to be named at some later date and then affirmatively waived any allegation of prejudice, where counsel requested, and seemingly accepted, a specific remedy for the late disclosure and did not specifically raise the issue of belated disclosure again during the trial.

¶ 87    Second, defendants have not provided this court with anything specific they would have done differently had they known Estrada's identity earlier. The fact that they have not done so demonstrates that there was no prejudice to defendants. They were aware that plaintiff would call a billing witness from Northwestern, they sent multiple subpoenas *duces tecum* to Northwestern regarding plaintiff's medical bills, and they had ample time to find their own billing witness.

¶ 88    Third, the nature of the testimony, *i.e.* plaintiff's medical bills, was straightforward and routine and defendants, through their own subpoenas, should have had an idea of what the testimony would be.

¶ 89    Finally, our review of the record does not show that plaintiff was attempting any "tactical gamesmanship" in the late disclosure of Estrada. Plaintiff's counsel indicated during the pretrial hearing that they were waiting for Northwestern to name the person, and it appeared that plaintiff had little control over the timeliness of that identification.

¶ 90    Turning to the issue of foundation, contrary to defendants' assertion, Estrada provided a sufficient foundation to prove the unpaid portions of plaintiff's medical bills from Northwestern. "To introduce an unpaid bill into evidence, a party must establish that the bill is reasonable for the

services of the nature provided." *Kunz v. Little Co. of Mary Hospital & Health Care Centers*, 373 Ill. App. 3d 615, 624 (2007). Reasonableness can be established through the testimony "of a person having knowledge of the services rendered and the usual and customary charges for such services." *Arthur v. Catour*, 216 Ill. 2d 72, 82 (2005). The testifying witness must be able to demonstrate that "the charges are usual and customary charges for services in a similar geographic area in which the services were provided." *Kunz*, 373 Ill. App. 3d at 624-25. The foundation for admitting medical bills can be established through the testimony of the treating physicians or through the testimony of an employee of the medical facility who is familiar with the billing methods and reasonableness of the charges. *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 591 (2005). The party offering the billing witness has the burden of establishing their special knowledge, "but the determination of the sufficiency of qualifications rests largely in the sound discretion of the trial court." *Tsai v. Kaniok*, 185 Ill. App. 3d 602, 605 (1989).

¶ 91    In the case before us, Estrada's testimony satisfied these requirements. Estrada testified that he is familiar with usual, customary, and reasonable charges for hospital facilities and professional charges in the Chicagoland area. Prior to his work with Northwestern, he had years of experience working with a company involved in billing customer service for different organizations around the United States. He has had seven years of experience at Northwestern, where he has assisted patients with resolving billing disputes by investigating and auditing charges to ensure they are "in line with other outside organizations" in the Chicagoland area. He also testified that an outside company annually audits Northwestern's services, "where they make sure that [Northwestern's] charges are in comparison to other teaching institutes and in line with [the Centers for Medicare & Medicaid Services] guidelines." Based on this testimony, we cannot say that the trial court's decision to allow the testimony was arbitrary or unreasonable. Estrada had

numerous years of experience in medical billing in the Chicagoland area. Additionally, his familiarity with usual, customary, and reasonable medical charges was bolstered by regular auditing from an outside company. There is no requirement that a billing witness must have direct experience in the specific type of medical services rendered and their associated charges. Thus, the trial court did not abuse its discretion. See *Fraser v. Jackson*, 2014 IL App (2d) 130283, ¶ 39 (the trial court did not abuse its discretion in admitting the bills into evidence where a billing representative from the medical facility testified "via telephone that she had reviewed the charges and that they were customary and reasonable for the services rendered").

¶ 92 Nonetheless, defendants rely on *Klesowitch v. Smith*, 2016 IL App (1st) 150414, for support of this argument. In that case, the defendant objected to the reasonableness of the bills, arguing that the plaintiff failed to present any testimony on the bills that satisfied the foundational requirements. *Id.* ¶ 46. On appeal, this court held that the trial court improperly admitted certain portions of the plaintiff's medical bills into evidence where the plaintiff "did not call a witness with the requisite knowledge to testify [that] the total bills were fair and reasonable" and the defendant's expert, who addressed the medical bills, never testified as to whether he "possessed knowledge of the usual and customary charges for such services." *Id.* ¶ 47. However, the facts here are distinguishable. Plaintiff presented a witness on the issue of her medical bills, and he specifically testified as to the foundation for his knowledge of the usual and customary charges for the services. Thus, we find this case inapposite.

¶ 93 Instead, we find *Zaretsky v. Thoma*, 2021 IL App (1st) 192093-U, which plaintiff cites for support, to be instructive. In *Zaretsky*, the plaintiff sought to enter her medical bills, over the defendant's objection, for treatment for injuries she sustained in a car accident, and the defendant argued on appeal that the plaintiff "failed to lay a proper foundation that the charges were usual

and customary for the services rendered." *Id.* ¶ 2. In concluding that the trial court did not abuse its discretion, this court found that although the plaintiff's surgeon "does not prepare the billing statements, he demonstrated his familiarity with the cost of surgery at trial" because he had "performed thousands of similar surgeries throughout his career." *Id.* ¶ 23. The court also noted that it is not necessary for the witness to be a billing specialist to have knowledge of the usual and customary charges for the services. *Id. Zaretsky* demonstrates that a specific type of witness is not required to satisfy the foundational requirements. Furthermore, the foundation need not be overly lengthy or detailed to be sufficient, and a witness need not know all of the specifics of billing procedures to be sufficient. Thus, *Zaretsky* supports our conclusion that Estrada's testimony was sufficient to establish the necessary foundation.

¶ 94    As such, we conclude that the trial court did not abuse its discretion in allowing Estrada's testimony to be presented to the jury.

¶ 95                                    C. Appeal Bond

¶ 96    Plaintiff argues that the trial court erred in approving defendants' appeal bond where the amount was insufficient and the trial court did not comply with Illinois Supreme Court Rule 305(a) (eff. July 1, 2017). We recognize that our affirmance of the trial court's judgment on the jury's verdict seemingly moots the issue of whether the appeal bond is sufficient; however, because defendants may seek review in the supreme court, we nonetheless consider the appropriateness of the appeal bond.

¶ 97    "An appeal bond secures the appellee's judgment while the appellant pursues its appeal" and "prevents the appellee from executing on [her] judgment during the pendency of the appeal." *Inman v. Howe Freightways, Inc.*, 2022 IL App (1st) 210274, ¶ 73. Illinois Supreme Court Rule 305(a) (eff. July 1, 2017) governs the stay of enforcement of money judgments pending appeal.

As relevant here, the rule provides that the enforcement of a money judgment "shall be stayed if a timely notice of appeal is filed and an appeal bond or other form of security *** is presented to, approved by and filed with the court ***. *** The bond or other form of security shall be in an amount sufficient to cover the amount of the judgment and costs plus interest ***." *Id*. The rule allows for the court to consider "the relevant circumstances, including the amount of the judgment, anticipated interest and costs, the availability and cost of a bond or other form of security, the assets of the judgment debtor and of the judgment debtor's insurers and indemnitors, if any, and any other factors" to determine that a bond in the amount of the judgment plus interest and costs "is not reasonably available to the judgment debtor" and to approve a bond "in the maximum amount reasonably available to the judgment debtor." *Id.* If the court makes such a determination, it shall also "impose additional conditions on the judgment debtor to prevent dissipation or diversion of the judgment debtor's assets during the appeal." *Id.* The committee comments related to that paragraph state:

"It is anticipated that the amount of the bond or other form of security will normally be in an amount sufficient to cover the judgment, interest, and costs. In some limited instances, however, the appeal bond requirement may be so onerous that it creates an artificial barrier to appeal, forcing a party to settle a case or declare bankruptcy. [Citation.] Thus, the amended rule gives the court discretion in a money judgment case to approve a bond or other form of security that covers less than the entire amount of the judgment plus anticipated interest and costs. *** In such a case, the last sentence of the amended rule makes clear that appropriate conditions shall be imposed to prevent the judgment debtor from dissipating assets that would otherwise be available for payment of the judgment if the appeal is unsuccessful. Thus, depending on the circumstances, a business may be

precluded from selling or otherwise disposing of any of its assets outside the ordinary course of its business, or an individual might be prohibited from spending any sums other than are required for ordinary living expenses." Ill. S. Ct. R. 305, Committee Comments (adopted June 15, 2004).

¶ 98    Turning to the merits, we first note that this is an issue of first impression in this court. Our research has not revealed any case involving the sufficiency of an appeal bond under Rule 305(a) since the language allowing for less than the amount of the judgment plus interest and costs was added in 2004. This could, however, be the result of parties filing a motion for this court to review the bond in the original appeal from the underlying judgment, rather than filing a separate appeal following approval or denial of an appeal bond. See Ill. S. Ct. R. 305(h) (eff. July 1, 2017) (allowing for the reviewing court, upon motion, to change the amount, terms, or security of the bond). In any case, the language of the rule is clear that the amount of the bond, where it differs from the amount of the judgment, as in the case before us, is discretionary. As such, we review the trial court's approval of defendants' $1.85 million bond for an abuse of discretion. See *Stacke v. Bates*, 138 Ill. 2d 295, 302 (1990); *Pekin Insurance Co. v. Benson*, 306 Ill. App. 3d 367, 380 (1999) ("The power to grant stays is discretionary.").

¶ 99    Plaintiff contends that "there was no showing by [defendants] that a bond sufficient to cover the amount of the judgment plus interest would be 'onerous' or that [defendants were] in peril of bankruptcy"; rather, defendants only offered the insurance policy in support of their proposed bond. Plaintiff also argues that the trial court abused its discretion in failing to impose conditions on defendants to prevent the dissipation of assets, which is required under the plain language of Rule 305(a).

¶ 100    We agree with plaintiff and find that the trial court's failure to comply with Rule 305(a) was an abuse of discretion. The plain language of the rule and the committee comments are clear that, "normally," the appeal bond should be in the amount of the judgment plus costs and interest. Ill. S. Ct. R. 305, Committee Comments (adopted June 15, 2004). However, the rule was amended to allow for an appeal bond that is less than that amount, "[i]n some limited instances," where "the relevant circumstances, including the amount of the judgment, anticipated interest and costs, the availability and cost of a bond or other form of security, the assets of the judgment debtor and of the judgment debtor's insurers and indemnitors" demonstrate that the full amount is not reasonably available to the judgment debtor. *Id.*; Ill. S. Ct. R. 305(a) (eff. July 1, 2017). There is nothing ambiguous about this language, and the committee comments only serve to emphasize that this is a limited exception with clear guidelines and requirements.

¶ 101    Here, during the hearing on the appeal bond, plaintiff argued that defendants' proposed bond in the amount of $1.85 million was insufficient where the amount of the judgment was $2,865,495, and the bond would also need to cover costs and interests. In response, defendants provided the court with evidence of their insurance coverage which was limited to $1.85 million. Based on that, the trial court approved defendants' proposed bond. The trial court clearly approved a bond that was less than the full amount of the judgment plus costs and interest, and as such, the trial court was required to consider the relevant circumstances of defendants that would prevent them from covering the full amount. The record shows that defendants did not present any evidence to the court to suggest that they would have to declare bankruptcy in order to pursue an appeal if required to provide the full amount of the judgment. Further, defendants did not demonstrate that the insurance policy was an adequate substitute, and the mere existence of their insurance coverage does not determine whether the full amount of the judgment is "reasonably available" to

defendants. It is conceivable that defendants might have assets and funds available, outside of insurance coverage, that would cover the remainder of the full judgment plus costs and interests. As stated, nothing in the record shows that they presented any such evidence to the trial court, and defendants have provided this court with no reason to believe that there is any such evidence. To reiterate, nothing in the record below or on appeal shows that the full amount for an appeal bond would create a barrier to defendants' ability to appeal the judgment or that they would be required to declare bankruptcy. Because the trial court did not consider any circumstances of defendants that would necessitate the $1.85 million appeal bond, the court failed to comply with the rule and abused its discretion.

¶ 102    That, however, is not the only error gleaned from the record. Rule 305(a) also requires that the trial court "impose additional conditions on the judgment debtor to prevent dissipation or diversion of the judgment debtor's assets during the appeal." Ill. S. Ct. R. 305(a) (eff. July 1, 2017). Nothing in the record shows that the trial court imposed any conditions on Dr. K. Sklar, as an individual, or Foot First Podiatry, as a business, to prevent the dissipation or diversion of funds. The committee comments make clear that, where less than the full amount of the judgment plus costs and interests is offered, "appropriate conditions *shall* be imposed," meaning that the trial court did not have discretion in this aspect. (Emphasis added.) Ill. S. Ct. R. 305, Committee Comments (adopted June 15, 2004). Thus, even if the proposed amount was proper in light of defendants' "relevant circumstances," the trial court nonetheless erred in failing to impose conditions on defendants.

¶ 103    Defendants' arguments that we affirm the appeal bond are not persuasive. Defendants contend that none of the cases plaintiff cites are applicable here because they were issued prior to the amendment of the rule. However, the language of the rule is sufficiently clear such that we

need not resort to caselaw to determine that the court's approval of the bond did not comply with the rule. Further, defendants claim that, because there is no precedential caselaw on this precise issue, we cannot conclude that the trial court erred. This is illogical. If that were true, reviewing courts would never be able to interpret any new or amended rules and would need always to affirm the trial court's rulings even if incorrect.

¶ 104    Additionally, defendants argue that we should presume that the trial court's decision was in conformity with the law because plaintiff failed to provide this court with a transcript of the bond hearing. To support a claim of error on appeal, the appellant has the burden of presenting a sufficiently complete record. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). "Where the issue on appeal relates to the conduct of a hearing or proceeding, this issue is not subject to review absent a report or record of proceedings." *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001). Without a sufficient record, "the reviewing court must presume the circuit court had a sufficient factual basis for its holding and that its order conforms with the law." *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 157 (2005). A transcript of the hearing was not included in the record on appeal. However, a verbatim transcript is not always available, and thus, our supreme court rules allow for an acceptable substitute, namely a bystander's report. Ill. S. Ct. R. 323(c) (eff. July 1, 2017).

¶ 105    Plaintiff filed a bystander's report that memorialized the hearing, and the trial court approved it. As such, that bystander's report serves as the record of those proceedings, and this court may rely on it in determining that defendants did not satisfy their burden of showing that the full amount of the judgment was not reasonably available to them and that the insurance policy was an adequate substitute. Contrary to defendants' urging, the record does, in fact, indicate that the trial court failed to comply with Rule 305(a).

¶ 106    Accordingly, we conclude that the trial court's approval of defendants' proposed appeal bond was in error, and to the extent that defendants wish to seek further review of this action, the trial court's approval of the bond is reversed and the cause is remanded with directions.

¶ 107                                      III. CONCLUSION

¶ 108    For the reasons stated, we affirm the circuit court's entry of judgment on the jury verdict in favor of plaintiff. In the event defendants seek to stay the judgment while proceeding with further review, we reverse the trial court's approval of defendants' appeal bond for $1.85 million and remand for the limited purpose of reconsidering the appeal bond in conformity with Illinois Supreme Court Rule 305(a) and this order. The present stay of enforcement shall remain in effect for 60 days following the entry of this order to preserve the status quo while proceedings are conducted in the circuit court. Should additional time be necessary and reasonable to comply with this order, the circuit court may, in its inherent authority, grant a temporary stay of the enforcement of the judgment for that purpose. If defendants choose not to seek a stay of enforcement of the judgment for the purpose of seeking further review, the issue of the appeal bond is deemed moot.

¶ 109    Affirmed in part, reversed in part, and remanded with directions.

***Walsh v. Sklar*, 2025 IL App (1st) 231830**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-L-261; the Hon. Bridget J. Hughes, Judge, presiding. |
| **Attorneys for Appellant:** | Anthony M. Sam and Hannah K. Wiens, of Cunningham, Meyer & Vedrine, P.C., and Scott L. Howie and Connor J. Whitting, of Donohue Brown Mathewson & Smyth LLC, both of Chicago, for appellants. |
| **Attorneys for Appellee:** | James H. Dawdy III and Barry G. Bollinger, of Vrdolyak Law Group, LLC, of Tinley Park, for appellee. |